CANADIAN TRANSPORT COMPANY, a
division of MacMillan Bloedel (Alberni)
Limited Bocimar N.V. et al., Appellants,

v.

UNITED STATES of America.

No. 77–1693.

United States Court of Appeals,
District of Columbia Circuit.

Argued Oct. 19, 1978.

Decided Sept. 5, 1980.

Carroll E. Dubuc, Washington, D. C., for appellants.

Frederic D. Cohen, Atty., Dept. of Justice, Washington, D. C., with whom Earl J. Silbert, U. S. Atty., Washington, D. C., at the time the briefs were filed, Barbara Allen Babcock, Asst. Atty. Gen., and William Kanter, Atty., Dept. of Justice, Washington, D. C., were on the brief, for appellee.

Also Mary Gallagher, Atty., Dept. of Justice, Washington, D. C., entered an appearance for appellee.

Before ROBINSON, MacKINNON and ROBB, Circuit Judges.

ROBB, Circuit Judge:

Appellants Canadian Transport Company and Bocimar, N.V. sued the United States in the District Court, seeking damages for the refusal of the Coast Guard to permit M/V TROPWAVE to enter the port of Norfolk, Virginia on or about April 20, 1974. The ground of the refusal was that the master and officers of TROPWAVE were Polish nationals whose presence posed a risk to national security. Appellants asserted three causes of action in their complaint. The first alleged the tort of intentional interference with contract rights and was based upon the Suits in Admiralty Act, 46 U.S.C. § 741 et seq. (1976). The second, based on 28 U.S.C. § 1350 (1976), alleged that the Coast Guard's action violated the treaty obligations of the United States. Finally, appellants asserted that they had been deprived of their property without due process of law in violation of the Fifth Amendment.[1] On the parties' cross motions for summary judgment, the District Court granted the motion of the United States and dismissed all three counts for failure to state a claim upon which relief may be granted.[2] Plaintiffs appeal.

I.

TROPWAVE was owned by Tropwood A. G. Zug Switzerland, and chartered to appellant Canadian Transport. Canadian Transport in turn subchartered it to appellant Bocimar, N.V., a Belgian corporation. TROPWAVE flew the flag of Singapore and had a multinational crew, which included a Polish master and Polish officers.

On or about April 11, 1974 TROPWAVE sailed from Rotterdam, bound for Norfolk to secure a load of coal for delivery to Spain. At about the time of departure, James Cleary,[3] Canadian Transport's agent in the United States, received information from TROPWAVE's owner that Norfolk was a restricted area and that a 14-day pre-clearance might be required to enter the area.[4] Cleary immediately requested Coast Guard Headquarters in Washington to grant permission for TROPWAVE to enter Norfolk.[5] After numerous phone

---

1. The parties stipulated that venue was appropriate in the District of Columbia.

2. *Canadian Transport Co. v. United States*, 430 F.Supp. 1168 (D.D.C.1977).

3. Whether Cleary received his information before TROPWAVE sailed is disputed by the parties. For purposes of this appeal, we shall accept appellants' assertion that TROPWAVE sailed before the information was received.

4. The basis for the concern by the TROPWAVE's owner is uncertain, although it was probably an incident involving another of its ships, TROPWIND. TROPWIND, also commanded by a Polish master, was denied entry to Norfolk in 1973. Prior to this denial, however, it had called at several ports in the USSR.

There is no other indication in the record of how the TROPWAVE owner might have anticipated a problem at Norfolk.

5. The full text of the message sent to the Coast Guard on April 11 is as follows:
VESSEL M/V TROPWAVE
SINGAPORE FLAG POLISH OFFICERS CREW SPANISH—YUGOSLAVS—PHILLIPINE AFRICAN BULGARIAN OWNERS TROPWOOD A.G. ZUG SWITZERLAND UNDER CHARTER TO CANADIAN TRANSPORT CO. LTD. VANCOUVER RELET CHARTER TO BOEL SHIPYARD BELGIUM PRESENTLY SCHEDULED LOADING COAL NORFOLK TO ROTTERDAM. VESSEL INBOUND IN BALLAST ETA APRIL 22ND ETD AT LATEST MAY 8, 1974. VES-

calls between Mr. Cleary and officers in Coast Guard Headquarters, the Coast Guard denied the request on April 19. Cleary was subsequently informed that entry would be allowed when all Communist-bloc personnel were disembarked. Accordingly, TROPWAVE sailed to Baltimore, discharged its Polish officers, and returned to Norfolk to load coal. After loading, TROPWAVE returned to Baltimore, replaced the original crew, and delivered its load of coal to Spain. Appellants seek to recover almost $93,000 in damages allegedly caused by the Baltimore detours.

The Coast Guard's decision to bar TROPWAVE from Norfolk harbor was made pursuant to the Special Interest Vessel (SIV) Program. This program is administered by the Coast Guard under regulations issued by the Secretary of the Treasury. The Secretary's authority to prescribe these regulations derives from the Magnuson Act, which authorizes him to "make rules and regulations governing the anchorage and movement of any vessels, foreign or domestic, in the territorial waters of the United States" when the President "declares a national emergency to exist by reason of actual or threatened war, insurrection, or invasion, or disturbance or threatened disturbance of the international relations of the United States." 50 U.S.C. § 191 (1976). In addition, the Act gives the President authority to issue regulations governing the anchorage and movement of "foreign flag vessels" whenever he finds that "the security of the United States is endangered by reason of actual or threatened war, or invasion, or insurrection or subversive activity. . . ." *Id.* In 1950, President Truman issued Executive Order 10173, *reprinted in* 3 C.F.R. 356 (1949–53 Comp.), in which he stated that "the security of the United States is endangered by reason of subversive activity", and prescribed various regulations pursuant to section 191. The Secretary of the Treasury, relying upon this proclamation, adopted additional regulations, including the SIV program.[6] The SIV regulations are classified in the interest of national security. No publication of the ports to which it applies or its criteria for denying a vessel access to a port has been made.

## II.

Appellants first allege that the Coast Guard's actions amount to an intentional interference with their contract rights under the charter and subcharter agreements. They characterize this cause of action as a tort suit[7] brought under the Suits in Admiralty Act. That Act provides: "In cases where if such vessel[8] were privately owned or operated, or if such cargo were privately owned or possessed, or if a private person or property were involved, a proceeding in admiralty could be maintained, any appropriate nonjury proceeding in personam may be brought against the United States. . . ." 46 U.S.C. § 742 (1976). Because "[i]n a suit against the United States there cannot be a right to money damages without a waiver of sovereign immunity," *United States v. Testan*, 424 U.S. 392, 400, 96 S.Ct. 948, 954, 47 L.Ed.2d 114 (1976), the question presented for our decision is whether the Suits in Admiralty Act's waiver of sovereign immunity extends to the Coast Guard's actions.

SEL HAS NOT TRADED ANY COMMUNIST COUNTRIES HAS TRADED U.S.A. TO CONTINENT. SINCE BUILT VESSEL LOADED BALTIMORE JANUARY 74 NEW ORLEAND [sic] MARCH 74, UNDERSTAND NORFOLK CONSIDERED RESTRICTED PORT. WE THEREFORE MAKE REQUEST THAT VESSEL BE ALLOWED ENTRY NORFOLK.
(J.A. at 327)

6. Appellants do not dispute the authority of the Secretary to adopt these regulations.

7. Appellants state that the tort of intentional interference with contract rights is recognized in admiralty, *citing Aljassim v. S. S. South Star*, 323 F.Supp. 918 (S.D.N.Y. 1971).

8. The words "such vessel" and "such cargo" in section 742 refer to the previous section of the Act which exempts vessels and cargoes owned or possessed by the United States from arrest or seizure by judicial process. 46 U.S.C. § 741 (1976). [n.8 added]

If it does not, the District Court correctly dismissed the complaint.

### A. *The Discretionary Function Exemption.*

The government contends that the Coast Guard was engaged in the performance of a "discretionary function" and that the United States is therefore completely immune from suit in this case. Appellants note that the Suits in Admiralty Act contains no express exception for discretionary functions. By contrast, the Federal Tort Claims Act explicitly provides such an exemption:

> The provisions of this chapter and section 1346(b) of this title shall not apply to—
>
> (a) Any claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

28 U.S.C. § 2680 (1976).

Appellants argue that the failure of Congress to include such language in the Suits in Admiralty Act indicates its intent that no similar exception apply in admiralty cases brought against the United States. This view has been explicitly adopted by the Court of Appeals for the Fourth Circuit [9] and endorsed in dictum by the Court of Appeals for the Fifth Circuit,[10] but rejected by the Court of Appeals for the First Circuit.[11]

▮ We believe that respect for the doctrine of separation of powers requires that in cases arising under the Suits in Admiralty Act, courts should refrain from passing judgment on the appropriateness of actions of the executive branch which meet the requirements of the discretionary function exception of the FTCA. Accordingly, we align ourselves with the views expressed in the *Gercey* case and hold that a discretionary function exemption is implicit in the Suits in Admiralty Act.

Unfortunately, the legislative history of the Suits in Admiralty Act is not helpful in deciding this question. The words "if a private person or property were involved", were added to the Suits in Admiralty Act in 1960 by Pub.L. 86–770, 74 Stat. 912. This act also repealed the limitation of the Suits in Admiralty Act to suits involving only vessels employed as merchant vessels.[12] As the Supreme Court noted in *United States v. United Continental Tuna Corp.*, 425 U.S. 164, 96 S.Ct. 1319, 47 L.Ed.2d 653 (1976), the 1960 amendment was intended to eliminate "serious uncertainties about the reach of the Suits in Admiralty and Public Vessels Act on the one hand, and the Tucker Act on the other . . . ." *Id.* at 173, 96 S.Ct. at 1325. The problem was that the Public Vessels Act, 46 U.S.C. §§ 781 *et seq.* (1976) and the Suits in Admiralty Act "were not generally interpreted to encompass all actionable maritime claims against the United States. Maritime tort claims deemed beyond the reach of both Acts could be brought only on the law side of the district courts under the Federal Tort Claims Act. . . . More importantly, . . . contract claims not encompassed by either Act fell within the Tucker Act, which lodged exclusive jurisdiction in the Court of Claims for claims exceeding $10,-000. 28 U.S.C. §§ 1346(a)(2), 1491." 425 U.S. at 172, 96 S.Ct. at 1324. As a result, persons with maritime contract claims against the United States had to choose between proceeding in the district courts or in the court of claims, with the court's jurisdiction dependent upon whether a

---

**9.** *Lane v. United States*, 529 F.2d 175 (4th Cir. 1975).

**10.** *De Bardleben Marine Corp. v. United States*, 451 F.2d 140, 143–44 & note 15 (5th Cir. 1971).

**11.** *Gercey v. United States*, 540 F.2d 536 (1st Cir.) *cert. denied*, 430 U.S. 954, 97 S.Ct. 1599, 51 L.Ed.2d 804 (1976).

**12.** Thus, it is the 1960 amendment which would authorize admiralty suits such as this one,

"merchant vessel" was involved or not.[13] If plaintiff's counsel picked the wrong court, the case would be dismissed, and the statute of limitations for an action in the proper court often would have run.

To alleviate this problem, the 1960 bill authorized transfers of cases between the court of claims and the district courts. The Senate Judiciary Committee, however, looked upon the transfer provisions as only a "partial solution of the existing difficulties", and stated that it would be preferable to eliminate the cause of the problem. S.Rep.No.1894, 86th Cong., 2d Sess. (1960) at 6. Accordingly, it recommended that the bill be amended to repeal the "merchant vessel" limitation of the Suits in Admiralty Act, and to substitute the "private person or property" clause, thus giving the district courts jurisdiction of all maritime contract claims against the United States. This recommendation was adopted, and the bill passed as amended.

The legislative history of the "private person" language focuses exclusively upon the difficulties that had been created by the necessity of choosing between the court of claims and the district courts. The history did not focus on the extent of the liability in tort to which the United States was consenting.

Although the legislative history of the Suits in Admiralty Act is inconclusive on this point, the legislative history of the FTCA suggests that the exemption for discretionary functions in that Act was derived from the doctrine of separation of powers, a doctrine to which the courts must adhere even in the absence of an explicit statutory command. In *Dalehite v. United States*, 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427 (1953), the Supreme Court reviewed this legislative history at length. *Id.* at

24–30, 73 S.Ct. at 962–65. The Court noted that the exception "was drafted as a clarifying amendment", *id.* at 26, 73 S.Ct. at 963, and referred to testimony of the Assistant Attorney General, who advised the House judiciary Committee that " 'the cases embraced within [the new] subsection *would have been exempted from [the prior bill] by judicial construction.* It is not probable that the courts would extend a Tort Claims Act into the realm of the validity of legislation or discretionary administrative action, but H.R. 6463 makes this specific' ". *Id.* at 27, 73 S.Ct. at 963.[14] [Emphasis added]

Our recognition of a discretionary function exception in the Suits in Admiralty Act, therefore, is not an attempt to rewrite the statute, but merely an acknowledgement of the limits of judicial power. *See* 3 K. Davis, Administrative Law Treatise § 25.13 (1958) & (1970 Supp.); L. Jaffee, Judicial Control of Administrative Action, 244, 256–60 (1965).

Our conclusion that the discretionary function exception of the FTCA must be read into the Suits in Admiralty Act requires us to delineate the proper scope of that exception. The government appears to argue that if an action involves the exercise of judgment by a government employee, the action is discretionary and the United States is immune from suit. (Appellees' Br. at 35–36) Courts have recognized, however, that giving such a broad reading to the term "discretionary" would effectively immunize almost all government activity from suit under the FTCA.

In the *Dalehite* decision the Supreme Court attempted to narrow the meaning of "discretionary" somewhat by distinguishing between decisions made at the "planning" level, which are within *the exception,* and those made at the "opera-

---

where no vessel of the United States is involved.

**13.** As originally passed, the Suits in Admiralty Act gave jurisdiction over all maritime claims involving merchant vessels to the district courts. *See* 41 Stat. 525 (1920). The Public Vessels Act, however, gives the district courts jurisdiction over *tort* claims involving public vessels. Contract claims involving public ves-

sels could only be brought under the Tucker Act prior to the 1960 amendment.

**14.** (Quoting Hearings on H.R. 5373 and H.R. 6463 Before the Committee on the Judiciary, House of Representatives, 77th Cong., 2d Sess. at 29 (testimony of Asst. Attorney General Shea)).

tional" level, which are not subject to it. 346 U.S. at 42, 73 S.Ct. at 971. We think however that the result in this case should not turn upon whether the Coast Guard's actions can be labelled as "planning" or "operational". Although that distinction provides a useful guideline, a proper decision can be reached only by keeping the purposes of the discretionary function exemption in mind. The exercise of judgment which the exemption protects must be one which would otherwise involve courts in making a decision entrusted to other branches of the government. Decisions which require a government official to weigh competing policy alternatives are entitled to immunity for such decisions are the ordinary responsibility of the legislative and executive branches. In the *Dalehite* opinion itself, the Court stated that "[w]here there is room for *policy judgment* and decision, there is discretion." 346 U.S. at 36, 73 S.Ct. at 968. (Emphasis added) In Mr. Justice Jackson's words, "it is not a tort for government to govern.... *Id.* at 57, 73 S.Ct. at 978 (dissenting opinion). Conversely, if the decision involves only the implementation of policy choices already made, there is usually no reason for a court to refrain from passing judgment on the question of whether the statutory or regulatory mandate has been complied with.

The distinction between decisions which require judgment in the formulation of policy and those which involve only the implementation of policy choices already made has been recognized and approved by many courts, *e. g., Downs v. United States,* 522 F.2d 990 (6th Cir. 1975); *Griffin v. United States,* 500 F.2d 1059 (3d Cir. 1974); *Eastern Air Lines v. Union Trust Co.,* 95 U.S. App.D.C. 189, 221 F.2d 62, *aff'd per curiam sub nom. United States v. Union Trust Co.,* 350 U.S. 907, 76 S.Ct. 193, 100 L.Ed. 799 (1955); *Johnson v. State,* 69 Cal.2d 782, 73 Cal.Rptr. 240, 447 P.2d 352 (1968); K. Davis, *supra,* § 25.08 (Supp.1970). *See also*

*Rieser v. District of Columbia,* 183 U.S.App. D.C. 375, 388, 563 F.2d 462, 475 (1977), *modified on other grounds* 188 U.S.App. D.C. 384, 580 F.2d 647 (1978) (*en banc*) (applying the distinction to determine liability of the District of Columbia). Although the line dividing decisions which involve a choice between competing policy considerations and those which involve the implementation of choices already made may not always be well-defined, we believe that recognition of the purposes of the discretionary function exception requires a court to attempt to draw such a line.

B. *The Coast Guard's Failure to Give Notice.*

In order to apply the discretionary function exception properly, it is necessary to identify precisely the activities of the Coast Guard complained of by the appellants in their Suits in Admiralty Act case. Their major contention is that due to the classified nature of the SIV program, they were deprived of any notice that the nationality of TROPWAVE's crew members was a reason to expect that entry to Norfolk would be denied.[15] They aver that they first became aware of the possibility that there would be difficulty in entering Norfolk harbor only after TROPWAVE left Rotterdam, when it was impossible to arrange for substitute crew members without diverting the vessel.[16] Appellants do not dispute the validity of the SIV regulations themselves, nor do they complain because they are classified. It is the absence of any published notice which is the cause of the damages claimed.

We think the decision to keep the details, and even the existence, of the SIV program classified is immunized by the discretionary function exemption which we find in the Suits in Admiralty Act. The officials responsible for the promulgation of

---

**15.** Appellants state that the normal custom of the maritime industry is to look only to the nationality of a vessel rather than that of its crew in determining whether a vessel is to be excluded from a port.

**16.** As we have noted, the time when appellants become aware of a problem regarding TROPWAVE's entry to Norfolk is disputed. *See* note 3 *supra.*

the regulations were required to weigh the benefits to the maritime industry that might result from providing some notice of the existence of the program against the danger to national security that might result from publishing the details of the program.[17] We think the decision to protect the national security at the expense of whatever inconvenience might befall vessels such as TROPWAVE was a decision to favor one competing policy over another. It is not the province of the courts to second-guess such a decision in a damage action against the United States brought under either the Federal Tort Claims Act or the Suits in Admiralty Act.[18] Consequently, the District Court correctly dismissed the claim based upon the Coast Guard's failure to give any notice of the program.

## C. *Arbitrary Administration of the SIV Program.*

Appellants have advanced an alternative argument. They maintain that there is a basis in the record for concluding that the Coast Guard officers who made the actual decision to bar TROPWAVE did so arbitrarily, and that the United States is not immune from suit for such actions. Appellants allege that although the presence of "communist bloc" crew members on TROP-

WAVE was the reason for barring it from Norfolk, other ships belonging to its owners called at Norfolk despite the presence of "communist bloc" officers. Appellants submitted affidavits in connection with the summary judgment motions which alleged that TROPWOOD, a Liberian flag vessel commanded by a Yugoslavian master entered Norfolk harbor twice in 1973 and five times in 1975.[19] In addition, appellants alleged that another ship, TROPWIND, commanded by a Polish Master[20] called at Norfolk in 1976. Furthermore, the Coast Guard had published information stating that the port of Norfolk was open to Polish-flag fishing vessels.[21] According to the record Polish fishing vessels were entitled to limited docking rights at Norfolk pursuant to "an agreement by which its vessels may use U.S. ports." This agreement was publicized together with its limitations. *Id.* Because summary judgment was granted against the appellants, they are entitled to the benefit of all favorable factual inferences that may reasonably be drawn from this evidence.[22] We believe that appellants' evidence created an inference that the SIV program was applied to them arbitrarily. Accordingly, we must decide whether summary judgment was appropriate even if the Coast Guard's action was arbitrary.[23]

---

**17.** It appears from the manner in which appellants learned of the restrictions that there was public knowledge that the Port of Norfolk was a restricted area. TAN 4.

**18.** We do not hold that courts must uncritically accept every decision to withhold information which the executive branch seeks to justify in the interest of national security. It is clear that when information is sought because of its relevance to a judicial proceeding, "[t]he court itself must determine whether the circumstances are appropriate for the claim of privilege." *United States v. Reynolds,* 345 U.S. 1, 8, 73 S.Ct. 528, 532, 97 L.Ed. 727 (1953). *See also Committee for Nuclear Responsibility, Inc. v. Seaborg,* 149 U.S.App.D.C. 385, 391, 463 F.2d 788, 794 (1971).

**19.** J.A. at 66–88.

**20.** J.A. at 89–92.

**21.** J.A. at 488.

**22.** *Rodway v. U. S. Dept. of Agriculture,* 157 U.S.App.D.C. 133, 138, 482 F.2d 722, 727

(1973); *Semaan v. Mumford,* 118 U.S.App.D.C. 282, 283, 335 F.2d 704, 705 (1964).

**23.** The government has argued that appellants have admitted that the SIV program was properly applied to the TROPWAVE by failing to deny the government's assertion in its Statement of Material Facts presented to the district court that the "TROPWAVE was denied entry to Norfolk pursuant to the Special Interest Vessel program." (J.A. at 110) The government contends that this statement incorporates an affidavit of Lt. Cmdr. Chittick of the Coast Guard which states that "all applicable directives, instructions and internal guidelines were followed" by the officers who made the decision to bar the TROPWAVE. (J.A. at 115) We reject this argument, since appellants' Statement of Genuine Issues summarized the evidence upon which the claim of arbitrary action is based. Chittick's statement simply created an issue of fact. Furthermore, the words "pursuant to" upon which the government relies, appear to state a conclusion of law.

The government contends that the decision to bar TROPWAVE called for "considerable evaluation and discussion" and an "exercise of judgment" (Appellee's Br. at 35) that the Coast Guard was therefore engaged in a discretionary function and no damage action may be maintained under the Suits in Admiralty Act.

■ Although we have recognized that the Suits in Admiralty Act contains a discretionary function exception, we have limited the exception's scope to the exercise of discretion in formulating government policy making authority to the officers responsible for administering the program. At this stage of the proceedings, therefore, we cannot say that the Coast Guard was performing a discretionary function when it admitted TROPWIND and Polish fishing vessels but excluded TROPWAVE. By failing to show that the Coast Guard officers were making policy judgments when these actions were taken, the government has failed to meet its burden of establishing that it is entitled to summary judgment as a matter of law.[24] Accordingly, we cannot affirm the grant of summary judgment to the government on this ground.

The District Court did not rely on the discretionary function exception, but held that there has been no waiver of sovereign immunity for any claim of wrongful administration of the SIV regulations because the Coast Guard's activity was "uniquely governmental".[25] The court cited the language in the Suits in Admiralty Act which waives sovereign immunity only in cases where a proceeding could be maintained "if a private person or property were involved". 46 U.S.C. § 742 (1976). The court noted that the legislative history was not helpful in interpreting this provision, and that there has been relatively little case law construing it. It looked to the similar language in the FTCA,[26] however, and concluded that it should rely upon FTCA case law, believing that the two provisions should be construed *in pari materia.*

■ We believe the District Court was correct in looking to the FTCA cases in construing the Suits in Admiralty Act's "private person" language. We think that the court erred, however, in concluding that those cases establish an exception for "uniquely governmental" action.

The District Court relied upon *Feres v. United States,* 340 U.S. 135, 71 S.Ct. 153, 95 L.Ed. 152 (1950). In that case the Court held that a soldier on active duty could not recover against the United States for injuries which "arise out of or are in the course of activity incident to service." *Id.* at 146, 71 S.Ct. at 159. The Court cited five factors influencing its holding: (1) the absence of a parallel private liability, since no private person has the power to organize a military force; *id.* at 141–42, 71 S.Ct. at 156–57; (2) the presence of a comprehensive compensation system for military personnel, *id.* at 144–45, 71 S.Ct. at 158; (3) the small number of private bills which had sought compensation for members of the military, *id.* at 140, 71 S.Ct. at 156; (4) the exclusively federal nature of the relationship between a soldier and the United States, *id.* at 143–44, 71 S.Ct. at 157–58; (5) the variations of state law to which members of the military would be subjected involuntarily, since they have no choice in where they are sent, *id.* at 142–43, 71 S.Ct. at 157.

The government argues that the first factor identified in *Feres v. United States* is present here, that the protection of national security and conduct of foreign affairs are activities that only the United States conducts. Therefore, says the government, no liability can be imposed upon the United States because no private person would

---

**24.** *Semaan v. Mumford, supra,* note 21.

**25.** 430 F.Supp. at 1171.

**26.** "The United States shall be liable ... in the same manner and to the same extent as a private individual under like circumstanc-

es...." 28 U.S.C. § 2674 (1976). *See also id.* § 1346(b) (United States liable "under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.")

ever undertake such actions, let alone be held liable for performing them wrongfully.

We conclude however that subsequent Supreme Court decisions have so narrowed the *Feres* holding that the case will no longer support the government's position. In *Indian Towing Co. v. United States*, 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48 (1955), the Court noted that "all Government activity is inescapably 'uniquely governmental' in that it is performed by the Government.... 'Government is not partly public or partly private, depending upon the governmental pedigree of the type of a particular activity or the manner in which the Government conducts it.'" *Id.* at 67–68, 76 S.Ct. at 125–26, quoting *Federal Crop Ins. Corp. v. Merrill*, 332 U.S. 380, 383–84, 68 S.Ct. 1, 2–3, 92 L.Ed. 10. In deciding that a suit could be brought against the United States for the Coast Guard's negligent operation of a lighthouse, an activity which the government had contended was "uniquely governmental", the Court stated, "we would be attributing bizarre motives to Congress were we to hold that it was predicating liability on such a completely fortuitous circumstance—the presence or absence of identical private activity." 350 U.S. at 67, 76 S.Ct. at 125. (footnote omitted)

In *Rayonier Inc. v. United States*, 352 U.S. 315, 77 S.Ct. 374, 1 L.Ed.2d 354 (1957), the Court held that the FTCA would permit recovery against the United States for the negligence of the Forest Service in fighting a fire. It cited *Indian Towing v. United States* for the proposition that "an injured party cannot be deprived of his rights under the Act by resort to an alleged distinction, imported from the law of municipal corporations, between the Government's negligence when it acts in a 'proprietary' capacity and its negligence when it acts in a 'uniquely governmental' capacity." *Id.* at

319, 77 S.Ct. at 376. (footnote omitted) And in *United States v. Muniz*, 374 U.S. 150, 83 S.Ct. 1850, 10 L.Ed.2d 805 (1963), a unanimous Court appeared to limit the *Feres* decision to its particular facts:

> In the last analysis, *Feres* seems best explained by the 'peculiar and special relationship of the soldier to his superiors, the effects of the maintenance of such suits on discipline and the extreme results that might obtain if suits under the Tort Claims Act were allowed for negligent orders given or negligent acts committed in the course of military duty....'

*Id.* at 162, 83 S.Ct. at 1857, *quoting United States v. Brown*, 348 U.S. 110, 112, 75 S.Ct. 141, 143, 99 L.Ed. 139 (1954).[27]

 Many recent cases have imposed liability upon the United States for its performance of activities that are not usually performed by private persons. In addition to the cases we have mentioned, the United States has been held liable for negligence in the operation of prisons, *United States v. Muniz, supra*, trespasses and invasions of privacy by law enforcement officers, *Black v. Sheraton Corp. of America*, 184 U.S.App. D.C. 46, 564 F.2d 531 (1977), negligence of an FBI agent attempting to prevent an airplane hijacking, *Downs v. United States*, 522 F.2d 990 (6th Cir. 1975) *supra*, and negligence by air traffic controllers, *Eastern Air Lines v. United States, supra; Yates v. United States*, 497 F.2d 878 (10th Cir. 1974); *Ingham v. Eastern Air Lines*, 373 F.2d 227 (2d Cir.) *cert. denied*, 389 U.S. 931, 88 S.Ct. 295, 19 L.Ed.2d 292 (1967); *United Air Lines v. Wiener*, 335 F.2d 379 (9th Cir. 1964). We believe that the appellants' claim was not barred merely because the Coast Guard was engaged in an activity not usually engaged in by private persons. *See also Universe Tankships, Inc. v. United*

---

**27.** The extent of the limitations placed upon *Feres v. United States* may also be observed by comparing the Court's declaration in that case that the effect of the FTCA was "to waive immunity from recognized causes of action and was not to visit the Government with novel and unprecedented liabilities", 340 U.S. at 142, 71 S.Ct. at 157, with the subsequent statement in *Rayonier v. United States* that the very purpose

of the Tort Claims Act was to waive the Government's traditional all-encompassing immunity from tort actions and to establish novel and unprecedented governmental liability." 352 U.S. at 319, 77 S.Ct. at 376. *See also United States v. Muniz, supra*, at 159, 83 S.Ct. at 1856; "The Act extends to novel and unprecedented forms of liability as well."

*States*, 388 F.Supp. 276 (E.D.Pa.1974), *aff'd without considering this point*, 528 F.2d 73 (3d Cir. 1975).

 We do not construe the "private person" language of the Suits in Admiralty Act as totally without force, however. The statute requires that the United States can be sued only if an action in admiralty can be maintained "if a private person or property were involved". This language means that a cause of action in admiralty would exist for the injury complained of by the plaintiff if that injury had been caused by a private person. Appellants maintain that a cause of action does exist in admiralty for intentional interference with contractual rights by a private person,[28] and the government does not dispute this.[29] The government argues, however, that in order to determine whether the Coast Guard *wrongfully* interfered with the appellants' contractual rights, the District Court must judge whether the SIV regulations were properly applied, a standard that by its very nature does not apply to private persons. Courts have not hesitated, however, to evaluate the conduct of government employees in light of federal regulations in order to determine whether there has been a breach of duty actionable in tort. In *Downs v. United States*, 552 F.2d 990 (6th Cir. 1975) *supra*, the court held that because the FBI's policy for dealing with hijackers had been embodied in regulations, an FBI agent would be required to implement those regulations with the degree of skill expected of an FBI agent with comparable training in handling such matters. *Id.* at 1002. Simi-

larly, liability has been imposed for the failure of air traffic controllers to follow federal regulations governing the handling of aircraft. *Yates v. United States, supra; Ingham v. Eastern Air Lines, supra.* Not every violation by the government of its regulations will give rise to an action under the Tort Claims Act or the Suits in Admiralty Act. If, however, a cause of action would normally require proof that a private person acted wrongfully or without authority, the presence of that element may be proven in an action against the United States by reference to standards applicable to federal employees.[30]

 We therefore hold that if the Coast Guard officers acted arbitrarily and in violation of regulations in diverting TROP-WAVE, the United States is not immune from a damage action brought under the Suits in Admiralty Act. Because there is an inference in the record that there was such arbitrary action, the District Court's entry of summary judgment was inappropriate. We emphasize, however, what we are *not* holding. We do not believe the inference created by appellants' evidence is so overwhelming that summary judgment in their favor is appropriate, or that, standing alone, it would necessarily be sufficient to meet their burden of proof at trial. Nor do we express any opinion on the question of whether the government must make the SIV regulations available to appellants.[31] We hold only that until some satisfactory explanation of the inference of arbitrary action is provided by the government, it is not entitled to summary judgment on the

28. See note 7 *supra*.

29. Appellee's Br. at 28.

30. The government argues that for the District Court to decide whether the SIV regulations were applied improperly, it must "become involved in making substantive decisions under the SIV program", such as whether TROP-WAVE's diversion was warranted by national security considerations, or whether alternatives less drastic than diversion would have been appropriate. It also argues that the court would be involved in political questions related to the conduct of foreign affairs which are

beyond its competence. (Appellee's Br. at 29) Because we do not know the contents of the regulations, these assertions are speculative at this time.

31. Appellants attempted to discover the regulations, but the government refused to produce them on the grounds that they were privileged. At oral argument, counsel for the appellants asserted that the District Court had accepted the government's claim and denied their motion to compel discovery. No such order is reflected in the record, however.

Suits in Admiralty Act claim on the grounds of sovereign immunity.[32]

### III.

Appellants' second cause of action alleged that the exclusion of TROPWAVE violated the Treaty of Commerce and Navigation of 1815 between the United States and Great Britain (the 1815 Treaty), 8 Stat. 228.[33] Appellants argue that the District Court had jurisdiction to award them damages under 28 U.S.C. § 1350 (1976), which provides: "The district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." Because nothing in the language of this statute indicates that the United States has waived its sovereign immunity from tort suits for treaty violations, the District Court's decision dismissing this cause of action must be affirmed unless appellants can show another basis for concluding that sovereign immunity has been waived.

▮ Appellants argue that the 1815 treaty itself is a waiver of sovereign immunity. They rely upon Article 1 of the treaty:

The inhabitants of the two countries, respectively, shall have liberty freely and securely to come with their ships and cargoes to all such places, ports, and rivers, in the territories aforesaid, to which other foreigners are permitted to come, to enter into the same, and to remain and reside in any parts of the said territories, respectively; also to hire and occupy houses and warehouses for the purposes of their commerce; and, generally, the merchants and traders of each nation, respectively, shall enjoy the most complete protection and security for their commerce, but subject always to the laws and statutes of the two countries, respectively.[34]

Nothing in the quoted language indicates that the United States has agreed to be held liable in damages if the treaty is violated. In the absence of specific language in the treaty waiving the sovereign immunity of the United States, the treaty must be interpreted in accord with the rule that treaty violations are normally to be redressed outside the courtroom. As the Supreme Court explained in *The Head Money Cases*, 112 U.S. 580, 598, 5 S.Ct. 247, 28 L.Ed. 798 (1884);

A treaty is primarily a compact between independent nations. It depends for the enforcement of its provisions on the interest and the honor of the governments which are parties to it. If these fail, its infraction becomes the subject of international negotiations and reclamations, so far as the injured party chooses to seek redress, which may in the end be enforced by actual war. It is obvious that with all this the judicial courts have nothing to do and can give no redress.

*See Z & F Assets Realization Corp. v. Hull*, 72 U.S.App.D.C. 234, 241, 114 F.2d 464, 471, *aff'd on other grounds* 311 U.S. 470, 61 S.Ct. 351, 85 L.Ed. 288 (1941) ("it is not for the judiciary to determine whether a treaty has been broken either by the legislature or the executive. . . .") (footnotes omitted). *See also Dreyfus v. Von Finck*, 534 F.2d 24 (2d Cir.) *cert. denied*, 429 U.S. 835, 97 S.Ct. 102, 50 L.Ed.2d 101 (1976); *Pauling v. McElroy*, 164 F.Supp. 390 (D.D.C.1958), *aff'd* 107 U.S. App.D.C. 372, 278 F.2d 252, *cert. denied* 364 U.S. 835, 81 S.Ct. 61, 5 L.Ed.2d 60 (1960).

---

**32.** Appellants have also argued that the Coast Guard was negligent in taking eight days to arrive at a final decision barring the TROPWAVE. This theory was not presented to the District Court, however, and has therefore been waived by appellants.

**33.** In the District Court, appellants claimed that the United States had violated three treaties, but on appeal they have argued only that the 1815 Treaty was violated.

**34.** Appellants state that the 1815 Treaty is fully applicable to Singapore by virtue of the Consular Convention, United States—United Kingdom, entered into force Sept. 7, 1952, 3 U.S.T. 3426, T.I.A.S. No. 2494, and that TROPWAVE, which flew the flag of Singapore, is covered by the language quoted in the text. We assume, without deciding, that this is so.

Accordingly, we hold that the District Court correctly dismissed appellants' second cause of action.

### IV.

Appellants' final contention is that the Coast Guard's failure to give notice of the existence of the SIV program violated the Fifth Amendment's due process clause. Their theory is that their rights to receive payments under the chartering agreements involved in this case are their "property" and that they were deprived of at least a portion of this "property" when TROP-WAVE was diverted to Baltimore. They argue that the due process clause required the Coast Guard to give them notice before this "deprivation" took place.

The appellants argue that "private persons" can be guilty of Fifth Amendment violations, in the same way that individual federal employees are liable for violations of the Fourth and Fifth Amendments. *Bivens v. 6 Unnamed Agents of Federal Bureau of Narcotics*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971); *Davis v. Passman*, 442 U.S. 228, 99 S.Ct. 2264, 60 L.Ed.2d 846 (1979). The appellants note that the Suits in Admiralty Act waives the government's immunity in all cases where "if a private person or property were involved, a proceeding in admiralty could be maintained." 46 U.S.C. § 742. Thus it follows, the appellants say, that because a private person could be held liable in an admiralty action for violating Fifth Amendment rights, the government, which has waived its immunity by the Suits in Admiralty Act, can also be held liable.

 The flaw in the appellants' argument is that private citizens, acting in their private capacities, cannot be guilty of violating due process rights. The Fifth Amendment is a restraint on the federal government, not on private citizens.[35] The defendants in the *Bivens* case were government agents and in *Davis v. Passman* the defendant was a congressman who was sued for his official action as a congressman in hiring and dismissing his employees. *See id.* 442 U.S. 236, n.12, 99 S.Ct. 2272, n.12. The District Court correctly dismissed appellants' cause of action based upon the due process clause.

### CONCLUSION

The order denying appellants' motion for summary judgment is affirmed. The order granting summary judgment to the United States on appellants' second and third causes of action *is also affirmed.* The order granting summary judgment to the United States on appellants' first cause of action is affirmed with regard to the claim of failure to give notice of the regulations. With regard to the claim of arbitrary administration of the program, the judgment of the District Court is reversed, and the case is remanded for further proceedings in accordance with this opinion.

*So ordered.*

---

**35.** Appellants earnestly contend that this court's decision in *Miles v. District of Columbia*, 166 U.S.App.D.C. 235, 510 F.2d 188 (1975) stands for the proposition that damage actions may be brought against the United States for violations of the due process clause. The *Miles* case however involved an award of damages against the District of Columbia, whose sovereign immunity has been waived by Congress. D.C.Code § 1–102(a) (Supp. V 1978) (authoriz- ing the District of Columbia to "sue and be sued"). *See District of Columbia v. Woodbury*, 136 U.S. 450, 10 S.Ct. 990, 34 L.Ed. 472 (1889); *Barnes v. District of Columbia*, 91 U.S. 540, 23 L.Ed. 440 (1876); *Rieser v. District of Columbia*, 183 U.S.App.D.C. 375, 387–88, 563 F 2d 462, 474–75 (1977), *modified on other grounds*, 188 U.S.App.D.C. 384, 580 F.2d 647 (1978) (*en banc*).