**UNITED STATES FIRE INSURANCE COMPANY and Ottis Foster, Plaintiffs-Appellees,**

v.

**UNITED STATES of America, Defendant-Appellant.**

No. 85–8948.

United States Court of Appeals, Eleventh Circuit.

Dec. 31, 1986.

Thomas L. Jones, Torts Branch, Civ. Div. U.S. Dept. of Justice, Washington, D.C., Alan Van Emerick, for defendant-appellant.

Craig S. English, New York City, for plaintiffs-appellees.

Before TJOFLAT and KRAVITCH, Circuit Judges, and TUTTLE, Senior Circuit Judge.

KRAVITCH, Circuit Judge:

The United States appeals a judgment in an admiralty action imposing damages based on the Coast Guard's negligence in placing and maintaining markers in aid to navigation. At issue is whether the district court properly invoked subject matter juris-diction over this case under the United States' waiver of sovereign immunity in the Public Vessels Act (PVA), 46 U.S.C. §§ 781–790; the court concluded that the discretionary function exception to the United States' waiver of sovereign immunity does not apply. Appellant also contests the district court's holding that it should be liable in tort because the Coast Guard failed to properly mark a navigational hazard.

We affirm the court's holding that the federal courts have jurisdiction over this action under the PVA but reverse and remand on the negligence issue.

## I. BACKGROUND

This case arises out of the damage that occurred on July 8, 1983, when appellee Ottis Foster's vessel, the F/V CLARA & SUE, struck an underwater object in St. Simons Sound near Brunswick, Georgia. According to Foster and his insurer, appellee United States Fire Insurance Company, that underwater object was the remains of the Back River Daybeacon No. 4, an unlighted navigational aid maintained by the Coast Guard to mark the shoal area adjacent to the alternate Back River navigation channel.[1] Appellees claim that the CLARA & SUE struck the daybeacon as a result of the Coast Guard's negligence.

On May 20, 1983, the Aid to Navigation Team (ANT) of the Coast Guard Construction Buoy Tender SMILAX,[2] while transiting St. Simons Sound near Brunswick, discovered that Daybeacon No. 4 was missing. According to the district court, after making this discovery, the ANT leader, Petty Officer Craig Sullivan, followed standard Coast Guard operating procedures as prescribed in the Coast Guard's Aid to Naviga-

---

1. The daybeacon consists of two triangular shaped boards, imprinted with the number 4, that are mounted on a steel "H" beam and driven into the Sound's bottom. The Coast Guard erected the daybeacon so that it would be observed approximately eight feet above the surface of the water. It is not an aid critical to navigation in St. Simons Sound.

2. The Coast Guard Construction Buoy Tender SMILAX checks and maintains over 600 aids to navigation in a geographical area along the Savannah River, south coast of Georgia, and inlets in Florida, including the St. Marys River.

tion Manual (ATON Manual).[3] Appellees allege, however, that Sullivan failed to search for the downed daybeacon, as was required under the ATON Manual.[4] The district court did not make a finding on this claim.

According to the district court, Sullivan took the following course of action. Sullivan first set a temporary unlighted radar reflecting buoy (TRUB) on Daybeacon No. 4's estimated charted position. The court found that Sullivan employed only the three-arm protractor method to determine the daybeacon's estimated charted position; he did not use any other locating procedure. The three-arm protractor method involves taking horizontal sextant angles to known stationary structures ashore and then plotting the angles on a marine navigation chart of the area. Although the Coast Guard's ATON Manual permits the use of this method both for placing TRUBs and for locating wreckage, the manual states that this procedure is to be used as a method of "last resort."[5] ATON Manual, Positioning, Section 2–K(3) [hereinafter ATON Manual, Section 2–K(3)]. According to the manual, the preferred procedure is to employ the SMILAX's computer because this is more accurate than the three-arm protractor method.[6] *Id.* The district court found that Sullivan did not utilize the SMILAX's computer; the court did not make a finding as to whether he could have.

The district court found that after placing the TRUB in the daybeacon's estimated charted position, Sullivan radioed the Sev-

enth Coast Guard District in Miami and requested that it issue a Local Notice to Mariners (NTM) advising mariners that Daybeacon No. 4 was missing and had been replaced temporarily by a TRUB. In accordance with standard Coast Guard procedures, the Seventh Coast Guard District broadcasted the requested local NTM by radio three times daily at specified times over marine VHF Channel 22. The district court found that in this instance the Coast Guard continued the broadcast advisory until May 31—six days after it published the printed NTM—even though the Coast Guard generally stops broadcasting the NTM once a printed NTM is published.

Approximately one month after the ANT team installed the TRUB, the SMILAX herself returned to the estimated site of Daybeacon No. 4 to search for the downed daybeacon. The district court found that WO–3 David Wendell, Commander of the SMILAX, presumed that the daybeacon would be in its original position because, even if it had been knocked down and partially destroyed, its mounting would prevent it from floating. The district court did not make a finding, however, as to what procedure Wendell employed to estimate the daybeacon's original charted position—in particular whether Wendell used the computer, the three-arm protractor method, or simply searched for the daybeacon in the vicinity of the TRUB.

Wendell testified that he did not remember the details of the search for Daybeacon No. 4 because he routinely performed such

---

**3.** All references to the ATON Manual are to the manual in effect at the time the events in this case transpired.

**4.** Under the ATON Manual, whenever the Coast Guard discovers that a navigational marker like Daybeacon No. 4 is missing it is required to conduct "a thorough and effective underwater search ... to determine if ... parts of a collapsed structure have created an obstruction to navigation." ATON Manual, Seamanship, Section 7–15A(1) [hereinafter ATON Manual, Section 7–15A(1)].

**5.** Appellees claim that not only was this method the method of last resort, but the SMILAX was not authorized by the ATON Manual to have a

three-arm protractor on board for positioning buoys.

**6.** According to appellees, one generally recognized problem with the three-arm protractor method is that an error of one-eighth of an inch on the largest available nautical chart of St. Simons Sound could result in an actual error of 100 yards; the district court found that the chart the SMILAX used had a scale of 40,000:1. By way of comparison, appellees claim that, in the case of Daybeacon No. 4, the computer method of locating wreckage is accurate within an elipse measuring 1.9 yards by 0.8 yards.

operations during the years that he commanded the SMILAX. Wendell stated, however, that he had no reason to believe that he and the SMILAX crew employed anything other than routine procedures. Based on this statement, the district court found the SMILAX utilized routine procedures, including the use of a dragwire and grapnel to locate to the daybeacon.[7] The district court found, based on the SMILAX's log, that the SMILAX searched for the daybeacon for approximately three hours. The search proved unsuccessful. The SMILAX then checked to see that the TRUB was on the daybeacon's estimated charted position and abandoned the search.

Appellee Foster had arrived in the St. Simons Sound area in the CLARA & SUE in late May—after the TRUB was installed and the NTMs were issued. The district court found that Foster was familiar with the St. Simons Sound area because he had fished there regularly in late spring and early summer since 1979. According to the district court, Foster did not attempt to obtain either broadcast or printed local NTMs from either the Coast Guard or any other source upon or after his arrival in the St. Simons Sound area. These printed local NTMs were available to Foster, and to the rest of the public, free upon request. The local NTMs would have notified Foster of aid to navigation discrepancies. The NTMs also contain several cautionary notes, including the following: "NOTES: (1) Unless

otherwise indicated, missing and destroyed structures are presumed to be in the immediate vicinity. Mariners should proceed with caution." Despite the fact that Foster had not obtained any local NTMs, the district court found that Foster knew that Daybeacon No. 4 was missing and had seen the temporary buoy marking its location.

On July 8, Foster and his vessel left Brunswick for a fishing area in the Atlantic Ocean outside St. Simons Sound. Before the CLARA & SUE departed St. Simons Sound severe thunderstorms with heavy rains erupted. Foster turned around, sailed westward and then anchored the CLARA & SUE approximately 150 feet northwest of the TRUB replacing Daybeacon No. 4. Foster later got underway, steering the CLARA & SUE so as to stay to the channelward side of the TRUB.[8] According to appellees, Foster was relying on the TRUB to establish what water was free from any hazard presented by the old daybeacon structure; under the ATON manual, TRUBs are to be placed to the channelward side of any wreckage.[9] ATON Manual, Seamanship, Section 7–15D [hereinafter ATON Manual, Section 7–15D].

After Foster had been underway about five or ten minutes, he struck an underwater object that he alleges, and the district court found, was the downed Daybeacon No. 4. According to the district court, the CLARA & SUE suffered extensive damage

---

7. Based on this assumption that routine procedures were followed, the district court found that the SMILAX's first step in the search was to approach near the TRUB and drop its spuds, thereby securely anchoring itself to the bottom. Once the SMILAX was secure, Sullivan took horizontal sextant angles to known objects ashore to locate the vessel's position. He then used this data to calculate a course to the assigned position of the downed aid. SMILAX then moved to a closer but safe location near the assigned position and one of its boats was put over with a drag wire attached at its stern to a pair of "fishing" doors. This boat then made parallel sweeps over an area to the side of the SMILAX's barge. Simultaneously, the SMILAX crew used a grapnel suspended from the barge's crane to sweep the area ahead of the barge.

They repeated these processes for three hours. When no remains were located, the search was halted.

8. The district court found that Foster did not plot his position on the chart but instead relied on his "seaman's eye" to locate his vessel's position.

9. Section 7–15D of the ATON Manual reads: 1. Only in those cases where, after diligent effort, it has been found impossible to remove the wreckage will it be allowed to remain. In such cases it shall be buoyed with whatever equipment is on hand and a report made as to type, color, and number of buoy and location in yards and degrees from the wreckage. Such a buoy shall be as close to the wreckage as possible on the channelward side.

as a result of the collision.[10] The parties stipulated the damages to be $120,000.

On July 20, twelve days after the accident, the SMILAX again conducted a search for Daybeacon No. 4 at the site of the TRUB. According to the district court, although the SMILAX once again employed a dragwire and grapnel, the remains of the daybeacon were not located until the SMILAX's deck supervisor "fortuitously" happened to notice swirls which indicated to him the presence of an underwater object. This object proved to be the severely bent steel mounting of Daybeacon No. 4. The Coast Guard found the remains of the daybeacon ninety feet north of the TRUB—on the TRUB's channelward side. Appellees argue that the find was not simply "fortuitous." Rather, they claim that on this trip the Coast Guard employed the SMILAX's computer which enabled the Coast Guard to position the SMILAX close to the downed daybeacon, thereby enabling the deck supervisor to spot it.

Appellees brought the instant action in United States District Court seeking to recover for the damages the CLARA & SUE sustained as a result of the Coast Guard's alleged negligence. The district court asserted subject matter jurisdiction over the action under the PVA, 46 U.S.C. §§ 781–790. The court so held based on its conclusion that the discretionary function exception to the United States' waiver of sovereign immunity does not apply because the Coast Guard was obligated to use due care in placing and maintaining the TRUB. The district court then held the United States liable in tort on the ground that the Coast Guard was negligent in placing the TRUB to the channelward side of the downed daybeacon. The court found that this negligence was the actual and proximate cause of the damage done to the CLARA & SUE.[11]

## II. JURISDICTION

Appellant alleges that federal courts do not have subject matter jurisdiction over appellees' claim because the action comes within the ambit of the discretionary function exception to the United States' waiver of sovereign immunity in the PVA, 46 U.S.C. §§ 781–790. We conclude that although the United States' waiver of sovereign immunity in the PVA does implicitly contain a discretionary function exception, the exception does not apply in this case. Accordingly, we affirm the district court's assertion of subject matter jurisdiction over this action under the PVA.

### A.

This court has never ruled on the question of whether there is a discretionary function exception to the United States' waiver of sovereign immunity in the PVA. Therefore, although neither party has argued that the discretionary function exception does not apply to the PVA, we must now decide this issue.

■ Congress enacted the PVA to permit parties injured by public vessels to sue the United States in admiralty. 46 U.S.C. § 781. Both the PVA and the Suits in Admiralty Act (SAA), 46 U.S.C. §§ 741–752, contain broad waivers of sovereign immunity: in particular, neither statute expressly provides an exception for "discretionary acts" of government personnel, such as is found in the Federal Tort Claims Act (FTCA), 28 U.S.C. § 2680(a). This circuit, however, has held that the SAA implicitly contains a "discretionary function exception" to the United States' waiver of sovereign immunity, on the ground that the principle of separation of powers requires that the judiciary refrain from interfering in those executive branch actions that involve questions of public policy, economic

---

**10.** The CLARA & SUE was left with a large gash along its starboard side; it was gouged and holed in three places and one plank was turned out along a line running from bow to stern approximately seven feet below the water line.

**11.** The district court made no finding as to whether it was negligent for Sullivan to rely solely on the three-arm protractor method when he first installed the TRUB or as to whether Sullivan was negligent in not searching for the daybeacon.

expediency and administrative practicability. *Williams v. United States,* 747 F.2d 700 (11th Cir.1984) (per curiam), *aff'g and adopting, Williams ex rel. Sharpley v. United States,* 581 F.Supp. 847, 852 (S.D. Ga.1983); *accord Canadian Transp. Co. v. United States,* 663 F.2d 1081, 1085–86 (D.C.Cir.1980); *Gercey v. United States,* 540 F.2d 536, 539 (1st Cir.1976), *cert. denied,* 430 U.S. 954, 97 S.Ct. 1599, 51 L.Ed.2d 804 (1977). *But see Lane v. United States,* 529 F.2d 175 (4th Cir.1975); *De Bardeleben Marine Corp. v. United States,* 451 F.2d 140, 143–44 & n. 15 (5th Cir.1971) (holding in dictum that the SAA is a complete waiver of the government's sovereign immunity).[12] Based on these same concerns, and in light of the close relationship between the PVA and the SAA—which is exemplified by the fact that the former incorporates the latter to the extent that it is not inconsistent,[13] 46 U.S.C. § 782—we now hold that the PVA also implicitly contains a discretionary function exception to the United States' waiver of sovereign immunity.

## B.

Having established that there is a discretionary function exception to the United States' waiver of sovereign immunity in the PVA, we now must decide whether this exception applies in this action to abrogate federal subject matter jurisdiction.

**12.** The Eleventh Circuit, in the en banc decision *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981), adopted as precedent decisions of the former Fifth Circuit rendered prior to October 1, 1981.

Although at first blush it would appear that the district court in *Williams* impermissibly overruled *De Bardeleben,* the court in *Williams* concluded that the language in *De Bardeleben* was dictum because the plaintiff's complaint arose from governmental action that ordinarily would not be entitled to discretionary activity immunity; therefore the court did not need to address whether the SAA contains a waiver of discretionary function immunity. 581 F.Supp. at 851; *see Canadian Transp.,* 663 F.2d at 1085.

**13.** Under 46 U.S.C. § 782, suits brought under the PVA

shall be subject to and proceed in accordance with the provisions of the SAA or any amend-

The analysis of discretionary function exception issues in admiralty actions should proceed under the principles established in cases involving the discretionary function exception to the FTCA.[14] 28 U.S.C. §§ 2671–2680. Under the FTCA, the discretionary function exception precludes judicial review of any government decision in which there was "room for policy judgment and decision." *United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines),* 467 U.S. 797, 811, 104 S.Ct. 2755, 2764, 81 L.Ed.2d 660 (1984), *quoting, Dalehite v. United States,* 346 U.S. 15, 35–36, 73 S.Ct. 956, 967–68, 97 L.Ed. 1427 (1953). The exception thus prevents "judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of a tort action." *Varig Airlines,* 467 U.S. at 814, 104 S.Ct. at 2765; *Heller v. United States,* 803 F.2d 1558, 1563 (11th Cir.1986).

The discretionary function exception, however, was not intended to preclude judicial review of all government actions that require government employees to make choices. *Drake Towing Co., Inc. v. Meisner Marine Constr. Co.,* 765 F.2d 1060, 1064 (11th Cir.1985); *Canadian Transp.,* 663 F.2d at 1086. Instead, the test in this circuit of whether a government action is properly classified within the discretionary function exception is whether the govern-

ment thereof, insofar as the same are not inconsistent herewith, except that no interest shall be allowed on any claim up to the time of the rendition of judgment unless upon a contract expressly stipulating for the payment of interest.

**14.** Under the discretionary function exception as stated in the FTCA, the United States may not be held liable for:

Any claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

28 U.S.C. § 2680(a).

ment act is performed "at a planning rather than operational level and involve[s] considerations more or less important to the practicability of the Government's ... program." *Drake Towing,* 765 F.2d at 1064, *quoting, Dalehite,* 346 U.S. at 42, 73 S.Ct. at 971; *see Alabama Elec. Coop., Inc. v. United States,* 769 F.2d 1523, 1527 (11th Cir.1985); *Payton v. United States,* 679 F.2d 475, 480 (5th Cir. Unit B 1982) (en banc); [15] *see also Heller,* 803 F.2d at 1563–64.

In *Drake Towing,* this circuit considered whether the discretionary function exception applies to abrogate federal subject matter jurisdiction over an action for damages resulting from the Coast Guard's alleged negligent placement of a temporary buoy. The court held that, although the Coast Guard's initial decision as to whether or not to install a temporary buoy is a discretionary decision within the discretionary function exception, once the Coast Guard decides to establish the aid to navigation the execution of that decision is an operational decision which falls outside the exception. The court therefore concluded that the Coast Guard may be found liable for any negligence in placing, maintaining or operating a buoy. *Drake Towing,* 765 F.2d 1064–65; *see Williams,* 581 F.Supp. at 854; *see also Indian Towing Co. v. United States,* 350 U.S. 61, 64, 68–69, 76 S.Ct. 122, 124, 126–27, 100 L.Ed. 48 (1955) (once the government decides to operate a lighthouse it was required to do so with due care).

The United States contends that *Drake Towing* is not controlling because the court in *Drake Towing* was not faced with the issue of whether the Coast Guard's actions were in compliance with a policy directive, such as the ATON Manual. The government argues that under *Dalehite* this action comes within the discretionary function exception because the Coast Guard followed procedures that were permitted under the ATON Manual. We do not agree.

■ In *Dalehite,* the Supreme Court found that, in addition to shielding the government from liability for its negligent policy decisions, the discretionary function exception also shields the government from liability for the allegedly negligent acts of those individuals who were "carrying out the operations of government in accordance with official directions." 346 U.S. at 36, 73 S.Ct. at 968, *quoted in Varig Airlines,* 467 U.S. at 811, 104 S.Ct. at 2764.[16] This rule, however, is not sufficiently broad to pull the Coast Guard's alleged negligent acts in this case within the discretionary function exception. *Dalehite* shields the government from tort liability for its subordinates' negligence only where the alleged negligent acts were "dictated by guidelines adopted at the policy-making level." *Drake Towing,* 765 F.2d at 1065; *see Varig Airlines,* 467 U.S. at 811, 104 S.Ct. at 2764; *Dalehite,* 346 U.S. at 36, 73 S.Ct. at 968. *Dalehite* does not permit the government to find refuge behind the discretionary function exception whenever an employee's allegedly negligent behavior was among the permissible courses of conduct listed in a government manual or policy directive. *See Dalehite,* 346 U.S. at 36, 73 S.Ct. at 968; *Heller,* 803 F.2d at 1562 n. 5; *Drake Towing,* 765 F.2d at 1065. In particular, where the government employee's allegedly negligent acts were permitted under a government manual, the discretionary function exception clearly applies only where the manual either required that the employee commit the allegedly negligent acts or stated that the procedure used was the preferred procedure for achieving the goal in question. *See Drake,* 765 F.2d at 1065. Where, however, the manual per-

---

**15.** The Eleventh Circuit, in *Stein v. Reynolds Sec., Inc.,* 667 F.2d 33 (11th Cir.1982), adopted as precedent decisions of the former Fifth Circuit, Unit B, rendered after September 30, 1981.

**16.** Applying this rule, the Supreme Court held in *Varig Airlines,* that, since the Federal Aviation Administration's (FAA) decision to employ a "spot-checking" method to supervise airplane safety is an exercise of discretionary regulatory authority and therefore is non-actionable, the FAA employees actions in executing the spot-checking program in accordance with agency directives also is non-actionable. 467 U.S. at 819–20, 104 S.Ct. at 2768.

mits the employee to select among several permissible procedures to achieve a particular goal but states that one procedure is inferior to the others, the government cannot find refuge under the *Dalehite* rule should a government employee negligently select the inferior procedure when a preferable procedure was available. In this circumstance, the employee's decision to employ the inferior procedure is not required by a policy directive from above.[17] In addition, the employee's decision also is non-discretionary because the government's determination that one procedure is inferior to another establishes a standard by which the courts can judge the employee's actions. *See Heller*, 803 F.2d at 1563 (where there is a standard by which the government employee's action is measured, the discretionary function exception does not apply); *Alabama Elec.*, 769 F.2d at 1529 & n. 2 (same). This ranking is a policy decision that the federal courts will not review. *See Varig Airlines*, 467 U.S. at 811, 104 S.Ct. at 2764. Therefore, in these circumstances the employee's decision to use the inferior procedure is an operational one to which the discretionary function exception does not apply.

■ Applying these principles to the facts of this case we conclude that the discretionary function exception does not apply to the Coast Guard's decisions to employ the three-arm protractor method either to locate the wreckage or to position the TRUB because these decisions were not policy decisions themselves nor were they required by a policy directive such as the ATON Manual. Under the ATON Manual, the three-arm protractor method was the method of "last resort."[18] Therefore, the decision to use this method was an operational decision. This action thus falls outside the scope of the discretionary function exception to the extent that it is grounded on the Coast Guard's alleged negligence in using the three-arm protractor method.[19] We also conclude that federal courts have subject matter jurisdiction to consider whether the Coast Guard was negligent when it apparently failed to conduct a "thorough and effective search" for Daybeacon No. 4 when the daybeacon initially was discovered missing on May 20, 1983. Given that such a search was required under the ATON Manual, the government is not shielded from liability if the Coast Guard negligently failed to do so. *See Alabama Elec.*, 769 F.2d at 1529; *cf. Indian Towing*, 350 U.S. at 64, 76 S.Ct. at 124.

### III. STANDARD OF CARE

Having decided that federal subject matter jurisdiction exists to consider appellees' claim, we now turn to the issue of whether appellees have shown that the Coast Guard was negligent. The district court found the United States liable in tort on the ground that the Coast Guard was negligent in failing to place the TRUB to the channelward side of the downed daybeacon—as was necessary to adequately mark the hazard—and that this negligence was the actual and proximate cause of the damage incurred by the CLARA & SUE. We reverse this holding because the Coast Guard was not under an absolute duty to place the TRUB on the channelward side of Daybeacon No. 4.

■ The Coast Guard is not under an absolute duty to make waterways safe. *See Canadian Pac. (Bermurda), Ltd. v.*

17. We do not address whether the discretionary function exception would apply to a situation where the subordinate government actor employed one of several procedures that were listed in a policy directive as being equally effective for achieving a particular goal.

18. Nor was the Coast Guard's decision to employ the three-arm protractor method inextricably tied to a subsequent policy decision. *Compare with Heller*, 803 F.2d at 1564.

19. We base our holding in part on our conclusion that there is no evidence in the record that the Coast Guard could not employ the preferred procedures, in particular the computer or last observed angles. *See* ATON Manual, Section 2–K, at 2–18. Should the district court conclude on remand that, in employing the three-arm protractor method, the Coast Guard was utilizing the only permissible procedure available, the Coast Guard's decision would then come under the discretionary function exception.

*United States,* 534 F.2d 1165, 1170 (5th Cir.1976). Rather, the Coast Guard can be held liable in tort only when it negligently fails to perform duties which it has assumed, for example, either in policy directives, such as the ATON Manual, or through its actions. *See Drake Towing,* 765 F.2d at 1065.

■ The appellees claim that in the ATON Manual the Coast Guard assumed a duty to place TRUBs on the channelward side of any wreckage, citing ATON Manual, Section 7–15D. Although this section does require that the Coast Guard place markers to the channelward side of wreckage, it would be unreasonable to conclude that this duty applies even when the Coast Guard cannot find the wreckage. Such an interpretation would in essence place upon the Coast Guard an absolute duty to locate such wreckage. The federal courts, however, may not impose an absolute duty on the Coast Guard to locate wreckage given that under the ATON Manual the scope of the Coast Guard's duty to locate wreckage is limited to a duty to make a "thorough and effective underwater search." ATON Manual, Section 7–15A(1). In light of this, we hold that the absolute mandate of Section 7–15D, which requires that markers be placed on the channelward side of wreckage, applies only where the Coast Guard knows the location of the wreckage. Where the Coast Guard has conducted a thorough and effective, but unsuccessful, search for the wreckage, we hold that the Coast Guard's duty is limited to placing the TRUB to the channelward side of the estimated position of the wreckage and to issuing proper warnings.

■ In this case the Coast Guard did not find the daybeacon before it positioned the TRUB. Therefore, the district court was incorrect in basing its holding that the Coast Guard was negligent entirely on the fact that the TRUB was not placed to the channelward side of the wreckage. Instead, the district court should have inquired as to whether the Coast Guard inadequately satisfied the duty of care it had assumed. In particular, on remand it appears that in order to hold the United States liable, the district court would need to find either that the Coast Guard should have searched for, and probably would have found, the downed daybeacon, or that the Coast Guard probably would have positioned the TRUB to the channelward side of the daybeacon had it used proper procedures.[20] Moreover, the Coast Guard is not liable unless its negligence was the actual and proximate cause of the damages incurred by the CLARA & SUE. In considering the causation issue, the district court must compare what actually transpired, not simply against what would have transpired had the TRUB been placed to the channelward side of the buoy, but rather against what probably would have occurred had the Coast Guard exercised due care and satisfactorily fulfilled its duties as delineated in the ATON Manual.

We therefore reverse the district court's holding that the United States was negligent and remand for further proceedings consistent with this opinion.

AFFIRMED in part. REVERSED and REMANDED in part.

---

**20.** Appellees claim that the Coast Guard also is negligent for failing to remove the wreckage of the downed daybeacon. Although we do not rule on this issue, under the principles set forth in this opinion, to prevail on this claim appellees must show not only that the Coast Guard's negligence caused it to fail to locate the wreckage but also that the Coast Guard would have then been negligent had it failed to remove the wreckage during the time period between when it was discovered and when it was struck by the CLARA & SUE.