Anne E. MILES

v.

**DISTRICT OF COLUMBIA, a Municipal Corporation, Appellant,**

and

**John A. Taylor.**

No. 73–2250.

United States Court of Appeals, District of Columbia Circuit.

Argued Dec. 6, 1974.

Decided March 21, 1975.

David P. Sutton, Asst. Corp. Counsel for the District of Columbia, Washington, D. C., with whom C. Francis Murphy, Corp. Counsel, Louis P. Robbins, Principal Asst. Corp. Counsel, and Richard W. Barton, Asst. Corp. Counsel, Washington, D. C., were on the brief for appellant.

J. Hampton Baumgartner, Jr., Washington, D. C., with whom Bruce S. Mencher and Michael B. McGovern, Washington, D.C., were on the brief for appellee Miles.

Paul J. Sedgwick, Washington, D. C., entered an appearance for appellee Taylor.

Before LUMBARD,* Senior Circuit Judge for the Second Circuit, and McGOWAN and TAMM, Circuit Judges.

Opinion for the Court filed by Circuit Judge TAMM.

Opinion filed by Senior Circuit Judge LUMBARD, concurring in part and dissenting in part.

TAMM, Circuit Judge:

Plaintiff-appellee, Mrs. Anne E. Miles, brought suit in district court alleging that the destruction by the District of Columbia of two buildings owned by her constituted a taking of property without just compensation and due process of law. District Court Judge Oliver Gasch found that the demolition of appellee's property violated due process in that the District failed to grant a hearing at a meaningful time and in a meaningful manner and to provide for adequate notice. Miles v. District of Columbia, 354 F.Supp. 577 (D.D.C.1973). Hearings on damages were held before a Master, who recommended an award which Judge Gasch accepted. Although we adopt a narrower theory than the district court's, we find that the District failed to accord plaintiff due process of law, uphold the damage award, and affirm.

## I. Facts

Appellee, an elderly widow, owned two four-story buildings in Northwest Washington and since 1945 has paid all applicable real property taxes to the District of Columbia. She has resided two or three blocks from the buildings in question since 1932. A. 32–33, 36, 61–62. In June, 1963, the District of Columbia Board for the Condemnation of Insanitary Buildings (hereinafter "the Board") ordered appellee to show cause why her buildings should not be condemned, alleging insanitary conditions dangerous to health including broken windows and doors, decayed floors and stairways, and defective wiring and plumbing. A. 75, 85, 86. In November, 1963, the Board, after a hearing, issued an order pursuant to 5 D.C.Code § 618 (1973) condemning the building and directing appellee to abate the insanitary conditions or demolish and remove the buildings by March 12, 1964. A condemnation sign was posted upon the building. A. 62, 75, 90, 93.

* Sitting by designation pursuant to 28 U.S.C. § 294(d).

With Board permission, Mrs. Miles undertook to convert the buildings from tenement dwellings into apartment houses of eight units each. Toward that end, she obtained a $30,000 loan commitment from the Perpetual Building Association and hired a series of contractors who first gutted both buildings and then periodically performed work on the conversions. Appellee spent approximately $37,000 to $42,000 on the project. A. 62, 129–130.

Mrs Miles failed to meet the March 12, 1964 deadline imposed by the Board's order, but, as authorized by 5 D.C.Code § 620 (1973), obtained a series of extensions, the last of which expired on January 24, 1966. A. 76, 79. As the work progressed, the condemnation sign was removed from the building. A. 41. Mrs. Miles has stated that she received a representation during this period from a Board official that work had progressed too far for the building to come down. A. 69. To supervise its order, the Board sent the case to the Law Enforcement Division of the Corporation Counsel's Office, which also gave Mrs. Miles and her lawyer, Mr. George Hayes, assurances that the building would not be torn down. A. 57, 60.

An inspection in June, 1966 disclosed that repairs were incomplete, construction debris remained on the premises, and vandalism was present. A. 79. Between July, 1966 and August, 1967, the Board sent three letters to Mr. Hayes, pointing out that Mrs. Miles had failed to restore the buildings completely and absent prompt action by her, the Board would proceed against the buildings under the statute. A. 79–80. After an August, 1967 inspection, similar letters were sent in October, 1967, March, 1968, and February, 1969. A. 80. In May, 1969, following the death of Mr. Hayes and the subsequent death of the architect involved, the Corporation Counsel's Office sent the case back to the Board. A. 103.

On June 5, 1969, the Board reviewed the case and made an *ex parte* determination that the two buildings be processed for demolition. The Board also directed that Mrs. Miles be so informed. A. 63–64. On July 17, 1969, the Board sent notice by certified mail to George Windsor, Esquire, a former partner of Mr. Hayes. However, Mr. Windsor responded by letter on July 23, 1969 that he was "not the owner of these properties and neither am I the agent to them for purposes of receiving notices of any kind." A. 81. Apparently thereafter on July 25, 1969, the Board attempted to inform appellee by non-registered letter of its intention to demolish the buildings. A. 81. Mrs. Miles stated she did not receive the letter. A. 61. On July 29, 30, and 31, 1969, the Board attempted to provide notice through publication by placing an official notice in the *Washington Evening Star*. The property was identified only by address and lot number in a group notice, and the owner was given until noon on August 8, 1969 to commence repair or demolition of the buildings. A. 81–82. The record reveals no evidence that a condemnation notice was ever reposted on the property.

In October, 1970, a wrecking crew under contract with the District razed the two buildings. A. 63. This suit followed.

## II. Liability

The district court did not dispute the validity of the November 1963 condemnation order entered following hearing and notice. However, "[b]ased upon the peculiar facts of this case," the court concluded that appellee "was not afforded due process of law and, therefore, she is entitled to just compensation for the loss of her property." 354 F.Supp. at 585. Specifically, the court found that the Board failed to provide for a hearing at a meaningful time, since in June, 1969, appellee was not given "an opportunity to explain her position that the repairs should be continued rather than have her buildings razed." *Id.* at 581. Moreover, the district court found that under the facts of this case "due process of law requires no less than registered or certified mail notice as the type of feasi-

ble notice reasonably designed to inform the plaintiff of the Board's final decision to demolish and afford her the opportunity to register her objections." *Id.* at 585. We agree with the latter basis for the court's decision.[1]

■ A municipality in the exercise of its police power may, without compensation, destroy a building or structure that is a menace to the public safety or health. However, that municipality must, before destroying a building, give the owner sufficient notice, a hearing and ample opportunity to demolish the building himself or to do what suffices to make it safe or healthy; such a procedure is the essence of the governmental responsibility to accord due process of law. 7 E. McQuillan, Municipal Corporations § 24.561 (3d ed. 1968). The District of Columbia statute incorporates these procedural protections and substantive restraints, and its facial constitutional validity has been upheld. Keyes v. Madsen, 86 U.S.App.D.C. 24, 179 F.2d 40 (1949), cert. denied, 339 U.S. 928, 70 S.Ct. 628, 94 L.Ed. 1349 (1950).

■ However, the question remains whether the Board in the exercise of its police powers in this case afforded the proper constitutional and statutory protections before irrevocably depriving appellee of her vested property right without compensation. Appellee does not deny that she was accorded her full panoply of due process rights prior to the original 1963 condemnation order. She, however, contends that the Board had the duty to provide notice before ordering destruction of the buildings in 1969.

■ Our analysis begins with the Supreme Court's statement of the constitutional rule of notice in Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 314, 70 S.Ct. 652, 657, 94 L.Ed. 865 (1950):

> An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections. (citations omitted).[2]

In the instant case, the 1963 condemnation order was followed by a six year period during which appellee attempted to restore the buildings by obtaining substantial financing after receiving several extensions of time from the Board. After the last extension expired, the Board took no action for three years except for sending a sporadic stream of threatening letters. In fact, only after the July, 1969 decision to process the buildings for demolition was final action truly "pendent". Our inescapable conclusion is that under the circumstances of this case due process required that the Board convey to Mrs. Miles notice of its 1969 decision to finally have the buildings destroyed.[3]

■ Moreover, under the statutory scheme, notice in this case clearly would not have been a vain and empty gesture. If she had received notice of the Board's final decision, Mrs. Miles, pursuant to 5 D.C.Code § 628 (1973), could have taken

---

1. In light of this conclusion, we do not reach, nor express approval or disapproval of the district court's alternative ground that an additional hearing was required. Notice is generally considered a less burdensome requirement to place upon the government, and since, as discussed *infra*, appellee had additional statutory remedies available even absent the right to a 1969 hearing, we prefer to rest our decision on the notice issue.

2. The due process principles of notice have been applied to condemnation proceedings. *See* Schroeder v. City of New York, 371 U.S. 208, 83 S.Ct. 279, 9 L.Ed.2d 255 (1962);

Walker v. City of Hutchinson, 352 U.S. 112, 77 S.Ct. 200, 1 L.Ed.2d 178 (1956).

3. Of course, when faced with conditions extremely dangerous to health or safety, the government may act summarily without notice. *See* 7 E. McQuillan, Municipal Corporations § 24.561 (3d. ed. 1968). Such an emergency clearly did not exist in the case at bar. A period of six years passed between the Board's initial and final condemnation orders. Moreover, more than another year passed between the demolition order and the actual destruction of the buildings.

an administrative appeal to the Condemnation Review Board. If unsuccessful there, she then had the right to appeal to the District of Columbia Superior Court which "shall give precedence to any such case." *See* 5 D.C.Code § 629 (1973). While pursuing these remedies, the statute mandates that any challenged order be stayed. 5 D.C.Code § 622 (1973); *see* Urciolo v. Washington, 305 A.2d 252 (D.C.App.1973).[4]

The District places heavy reliance on the case of Tingle v. City of Wichita, 211 Kan. 119, 505 P.2d 717 (1973); in oral argument counsel proclaimed that *Tingle* was on "all-fours" with the case at bar. We disagree. In *Tingle*, the Kansas court upheld a jury finding that the demolition of a building was proper and that after condemnation no additional notice was required. However, the court focused on the crucial fact that the city followed the Kansas statute, which mandated that it inform the owner that he may undertake repairs but if he "fails to diligently prosecute the same until the work is completed, the governing body may cause the structure to be razed and removed." 505 P.2d at 721. The court then concluded that the propriety of both the owner's and the city's actions are questions of fact for the jury and upheld its verdict. *Id.* Thus, *Tingle* is a far cry from the instant case where the owner was not placed on such jeopardy notice and had in fact through a course of dealing with the government received every indication that no demolition was imminent.

■ Having concluded that due process required that the District provide notice in this case, we must then determine whether adequate notice was in fact afforded appellee. It is uncontested that notice by publication occurred through advertisement in the *Washington Evening Star.* However, this publication only identified the property by address and lot number, and ran in a group notice which included other properties. The Supreme Court described the deficiencies of this type of notice in Mullane v. Central Hanover Bank & Trust Co., *supra*, 339 U.S. at 315, 70 S.Ct. at 658:

> Chance alone brings to the attention of even a local resident an advertisement in small type inserted in the back pages of a newspaper . . . .. The chance of actual notice is further reduced when as here the notice required does not even name those whose attention it is supposed to attract, and does not inform acquaintances who might call it to attention.

We cannot conclude that this publication was reasonably calculated to apprise interested parties of the pendency of final action.

■ Besides the publication, the Board attempted to provide notice in July, 1969, by sending a certified letter to a law partner of appellee's deceased attorney. However, he responded that he was neither the owner of the properties nor an agent for receipt of notice. The District attempts to make much of the fact that when deposed in 1972, Mrs. Miles stated that at one point, the attorney, Mr. Windsor, "talked to me and told me he was acting on my account as a lawyer." A. 56. However, during that same deposition, appellee, in response to the direct question, "Do you consider Mr. Windsor to be your attorney?", answered, "I did not consider—I considered him nothing." A. 54. Moreover, at the time of its action in 1969, the Board had before it only Mr. Windsor's response. Its actions, therefore, are not sustainable on that ground.

The Board also attempted to notify Mrs. Miles directly by regular mail. She testified at her deposition she never received such a notice. A. 6. The fact of

---

4. The District apparently argues in its brief, albeit imprecisely, that *Urciolo* held that these statutory procedures are exclusive, *see* 305 A.2d at 254, and that appellee by by-passing these remedies has waived her right to challenge the demolition in the district court. *See* Appellant's Br. at 16, 23. However, even assuming the validity of that interpretation, we find that no waiver occurred where appellee was not provided timely notice in order that she could pursue her appropriate remedies.

non-receipt has never been put into dispute.

■ It is important to focus upon the statutory scheme for notice. 5 D.C. Code § 625 (1973) mandates that the Board forward notice required under the statute by registered or certified mail. Notice by publication is permissible only if the registered mail notice is returned for reasons other than refusal. While other methods are allowable, regular mail notice is explicitly recognized as not satisfying the statutory requirement. We must agree with the District Court which concluded that:

> This Court can discern no persuasive reason in this case for approving a mode of service that is less effective than that directed by the D.C.Code in those situations where a property owner is sent notice compelling him to show cause why his building should not be condemned.

354 F.Supp. at 585.[5]

In sum, we hold that the District failed to accord appellee due process by providing effective notice of its pendent final action and hence must be held liable for damages. The grant of summary judgment for appellee is affirmed.

### III. Damages

After entering summary judgment in appellee's behalf, the court referred to a special master the question of the proper assessment of damages. The Special Master held four days of hearings, the difficulty being the assessment of buildings which no longer existed. The Special Master issued findings of facts, including *inter alia*:

> Wallace L. Kidwell, a qualified real estate appraiser, testified that in June 1966 he appraised the property for loan purposes on behalf of Perpetual Building Association to have a value of $62,500 upon completion of rehabili-

tation. The value of the ground was $12,500 and $50,000 was projected as the value of the buildings. The income or capitalization approach was utilized for Kidwell's conclusion. Based upon the reproduction or cost method of appraising, he appraised the properties at a value of $72,500, with $60,000 attributable to the buildings and $12,500 to the land. (Plaintiff's Exhibit No. 12.)

. . . . .

> Frank Calcara, a qualified expert on the subject of the cost of rehabilitation of structures, was accepted as an expert witness by the Court and his qualifications were not questioned by the defendants. He testified, without objection, that the cost to replace the two buildings in their then existing condition immediately prior to the demolition in October 1970 would be $48,000, or $3,000 per unit for the "shells" alone . . . based upon his examination of the plans, specifications, and photographs, conversations with the plaintiff, examination of similar houses in the same row immediately adjacent to plaintiff's houses and a hypothetical question asked him containing all of the conditions of the buildings as recited by the witnesses, concluded that the cost to replace both buildings immediately prior to their demolition as they stood in that condition was approximately $78,800. . .

> Based upon District of Columbia Inspector Wilson's estimate that the buildings were 40% rehabilitated, Calcara's conclusion of value was that the buildings were worth approximately $92,800.

. . . . .

> Irvin R. King testified on behalf of the District of Columbia that based on the same hypothetical question the

5. The District, in attempting to justify the procedures it employed, asserts that the Board had previously sent registered letters to appellee which had been returned unclaimed, and that regular mail was the course of correspondence selected by appellee in her dealings with the Board. We find neither argument a persuasive rationale for departing from statutorily mandated procedures.

two buildings would sell for $17,000 or $8,500 each. He admitted that he was not an appraiser, not a broker, had not analyzed the blueprints for the buildings in question, belonged to no professional real estate organizations, had never qualified before as an expert in court, and only bought and sold property for his own account. King's experience in buying and selling properties similar to the ones in this case was nearly non-existent. In the opinion of this Court, King does not qualify as an expert to appraise the market value of the two properties involved in this case. This Court, therefore, gives little or no weight to his testimony.
A. 131–33, 135–36.

The Special Master determined that the "income approach to valuation is not controlling in this case since the buildings were never completed or were they ever income producing from the date rehabilitation commenced until their destruction." A. 136. He also found the fair market value approach not controlling, concluding that "this Court gives little or no weight to the testimony adduced by the defendant as to fair market value." He found the testimony on replacement value was credible, and applied it to recommend an award of $75,000 for the buildings and $3,500 for the land, a total of $78,500.

In a Memorandum-Order the district court "carefully reviewed the findings" of the Special Master and concluded that the District's fair market value evidence was not credible and that appellee's evidence "as to the cost of replacing the structures was the only credible expert testimony" before the Special Master. While recognizing that "[t]he proper measure of damages is never an easy question," the court upheld the Special Master and awarded $78,500 in damages. A. 194–95. The District attacks this award by arguing that the district court's finding that replacement cost estimates were the "only credible expert testimony" is plainly erroneous and that the court applied an erroneous damage standard. Appellant's Br. at 31–32.

We note that the appropriate measure of damages in this type of case is a question upon which neither this court nor the District of Columbia Court of Appeals has ruled. However, we also recognize that no single rule of damages exists and that the replacement cost method of calculation is one which has been recognized and utilized. *See, e. g.,* Missouri, Kansas & Texas Railway Co. v. Jackson, 174 F.2d 297 (10th Cir. 1949) (recognizing original cost and replacement cost evidence); Chicago, Milwaukee, St. Paul & Pacific Railroad Co. v. Tindal, 249 F.Supp. 988 (S.D.Iowa 1966) (utilizing replacement cost evidence); *cf.* United States v. 564.54 Acres of Land, 506 F.2d 796 (3rd Cir. 1974) (utilizing replacement value in eminent domain proceeding and rejecting restriction of that method to public condemnees). *See generally* 22 Am.Jur.2d §§ 138–40 (1965). Since the proper method of damage computation must vary with the facts of each case, we cannot conclude, as the District urges, that the mere invocation of the replacement cost standard is erroneous.

Turning to the facts, we recognize that the district court was bound by Fed. R.Civ.P. 53(e)(2) which instructs the court to accept the Master's findings of fact unless clearly erroneous. The Special Master found that the District's witness' testimony should be given little or no weight. He heard testimony from two qualified expert witnesses who gave damage estimates based upon alternative methods of computations. The District now apparently challenges the award of $78,500 by pointing to expert testimony quoting a lower, $60,000 figure. However, testimony was also elicited suggesting an even higher, $92,800 award. The Special Master determined that the $78,500 award was the most appropriate under the facts of this case; the district court, after reviewing carefully the Master's findings, found the replacement cost evidence "the only credible expert testimony" and "the most appropriate measure of compensation." A. 194–95. It is difficult to discern how the actions

of either the Special Master or district court were in error.

 A court's award of damages is a finding of fact; an appellate court will, therefore, not set aside an award unless it finds it "clearly erroneous." Fed.R.Civ.P. 52(a) [6]; see, e. g., Baggett v. Richardson, 473 F.2d 863, 865 (5th Cir. 1973); Cunningham v. Rederiet Vindeggen A/S, 333 F.2d 308, 312 (2d Cir. 1964). After carefully reviewing the record, we find that the district court's damage award is supported by the facts, is not clearly erroneous, and consequently should not be disturbed.

Affirmed.

LUMBARD, Senior Circuit Judge (concurring in part, dissenting in part):

Although I concur in the majority's conclusion that the District of Columbia failed to accord plaintiff due process of law, I believe that the district court's award of $75,000 for the damage to the buildings must be set aside.

The Special Master held:

3. The income approach to valuation is not controlling in this case since the buildings were never completed nor were they ever income producing from the date rehabilitation commenced until their destruction.

\* \* \* \* \* \*

6. The measure of damages to the buildings in this case is the cost to replace or reproduce them in the condition in which they existed immediately prior to their destruction in October of 1970, which was $37,500 per building or a total of $75,000. Chicago, Milwaukee, St. Paul & Pacific RR. Co. v. Tindal, 249 F.Supp. 988 (S.D. Iowa 1966).

Affirming that decision, the district court stated:

Considering the wrongful nature of the taking, that is, the demolition of the buildings without proper notice to plaintiff Miles, and considering the testimony presented to the Special Master, it is the conclusion of this Court that the cost of replacement as determined by Magistrate Margolis is the most appropriate measure of compensation to plaintiff Miles.

The Special Master erred as a matter of law in not taking account of the testimony of plaintiff's own witness, Wallace Kidwell, who testified as to the value of the properties using the capitalization-of-earnings or income approach. Mrs. Miles held the properties as investments, with a view toward again making them income-producing properties. Certainly their value to her as such should be taken into account to limit an assessment of damages based upon replacement cost. Indeed, the case cited by the Special

---

**6.** Rule 52(a) explicitly provides that "[t]he findings of a master, to the extent that the court adopts them, shall be considered as the findings of the court."

We are disturbed by one aspect of the district court's memorandum-order. The court found that

[c]onsidering the wrongful nature of the taking, that is, the demolition of the buildings without proper notice to plaintiff Miles, and considering the testimony presented to the Special Master, it is the conclusion of this Court that the cost of replacement as determined by Magistrate Margolis is the most appropriate measure of compensation to plaintiff Miles.

A. 195. The fact of liability, or the degree of wrongful conduct by a defendant, is never a proper factor in assessing damages in a case where punitive damages are inappropriate. If we believed that the court was attempting to punish appellants by its damage award, instead of compensating appellees, we would be forced to vacate the damage award.

However, we are unable to reach that conclusion on this record. There is no indication that the Special Master considered the District's wrongful action as a factor in reaching his damage award. The district court must accept those findings unless clearly erroneous and, except for the one questionable phrase, the district court's brief memorandum properly focused upon the damage evidence and the Special Master's findings. We reiterate that when compensatory damages are to be awarded, defendant's wrongdoing is an irrelevant factor and should never be considered.

Master stands for that very proposition. In Chicago, Milwaukee, St. Paul & Pacific RR. Co. v. Tindal, 249 F.Supp. 988 (S.D.Iowa 1966), the court found that the replacement cost of a railroad warehouse destroyed by fire was $8,000 (value new ($20,000), less depreciation prior to the fire ($12,000)). But as the defendant had paid an annual rental of only $284 for the building, which had few alternate uses, the court found the actual value to be only $3,000 (roughly ten times earnings).[1]

The Special Master disregarded Kidwell's testimony because the buildings were never completed and never produced any income between the date rehabilitation commenced and the date of demolition. However, Mr. Kidwell, an expert, clearly could and did make an estimate of the income-producing potential of the property based on rentals generated and costs incurred by similar properties when wholly rehabilitated. The fact that Mrs. Miles' properties never produced income following the commencement of rehabilitation does not make the capitalization-of-earnings-approach irrelevant. Indeed, it is the most appropriate measure because Mrs. Miles was rehabilitating the buildings for the very purpose of generating income.

Kidwell testified that, based on the capitalization-of-earnings-approach, the value of the buildings in 1966, if completed, would have been $50,000. However the value of the property as it then stood was probably somewhat less since Kidwell testified that the neighborhood had deteriorated since 1966. Moreover, Kidwell's determination of the value of the buildings was on the assumption that they were completed. Mrs. Miles' buildings were far from completed. The District of Columbia's examiner had concluded that the interior was only forty percent rehabilitated. Thus, it would be necessary to subtract the cost of completion from Kidwell's estimate of the properties' value in order to arrive at a proper damage award.

The majority suggests that the Special Master may have found that Kidwell's testimony using the income-valuation approach was not credible, and that that accounts for the exclusive focus on the cost of reconstruction in assessing damages. I must disagree. Kidwell was Mrs. Miles' own witness, and the Special Master described him as a "qualified real estate appraiser." His testimony, which took account of the location of the buildings and the rental income which would probably have been generated if the buildings had been completed, was not contradicted by any other witness. Calcara, plaintiff's other witness, was offered only as a professional builder and rehabilitator, not as a professional real estate appraiser. (A. 163) It seems that the Special Master disregarded Kidwell's testimony not because he did not find it credible, but because he incorrectly held that the measure of damages should be replacement cost, where the buildings were never completely rehabilitated prior to their demolition and had not begun to generate income again.

The majority opinion also relies upon the finding of the district court, reviewing the Special Master's award, that "the evidence put forth by plaintiff Miles as to the cost of replacing the structures was the only credible expert testimony before the Special Master." However the district court offered no reasons to support its conclusion, and indeed none are apparent from the transcript which the district court had before it. In these circumstances, I believe that the court's complete disregard of Kidwell's testimony as to the value of the buildings, based on an income or capitalization-of-earnings-approach, was clearly erroneous.

Moreover, the district court's finding as to Kidwell's credibility may well have been influenced by the court's apparent belief that the "wrongful nature of the taking" should be taken into account in assessing damages to Mrs. Miles. The court was clearly in error when it considered the inadequacy of the notice as a

---

1. *See also* O'Brien Bros. v. The Helen B. Moran, 160 F.2d 502, 505–06 (2d Cir. 1947) (damage to a ship).

factor in assessing damages. In any event the attempts of the District of Columbia to contact Mrs. Miles, even though constitutionally insufficient, make the district court's "punishment" rationale for the high damage award wholly inappropriate, especially since Mrs. Miles had discontinued any rehabilitation efforts years earlier and had permitted the properties to become more and more run down.

The damage award should be vacated and the case remanded for reconsideration of the amount of damages in light of the foregoing.