Green MILLER, Jr., Appellant,

v.

DISTRICT OF COLUMBIA, Appellee.

No. 89–683.

District of Columbia Court of Appeals.

Argued Oct. 22, 1990.

Decided Feb. 28, 1991.

Philip M. Musolino, Washington, D.C., for appellant.

Edward E. Schwab, Asst. Corp. Counsel, with whom Herbert O. Reid, Sr., Corp. Counsel at the time the brief was filed, and Charles L. Reischel, Deputy Corp. Counsel, Washington, D.C., were on the brief, for appellee.

Before ROGERS, Chief Judge, and STEADMAN, Associate Judge, and NEWMAN,* Associate Judge, Retired.

* Judge Newman was an Associate Judge of this court at the time of argument. His status changed to Associate Judge, Retired, on February 1, 1991.

STEADMAN, Associate Judge:

In an action brought under 42 U.S.C. § 1983, plaintiff-appellant Green Miller, Jr. sought damages from the District for the demolition of two buildings owned by him. The trial court granted summary judgment in favor of the District on the ground that Miller had failed to exhaust his administrative remedies. It has been established, however, that this requirement does not apply in § 1983 actions; and, even if it did, summary judgment was improper here. Accordingly, we reverse and remand for further proceedings.

I

In September of 1982, plaintiff-appellant Miller received an order to show cause from the District of Columbia Board of Condemnation of Insanitary Buildings (the "Board") why two buildings owned by him, 1330 and 1332 Belmont Street, Northwest, should not be condemned due to insanitary and unsafe conditions.[1] The Board decided to condemn both buildings in March 1983, after a hearing pursuant to D.C.Code § 5–703 (1981) and 29 DCRR § 4 (1972).[2] Appellant received notice of the issuance of the condemnation order but did not appeal the Board's action to a higher tribunal.[3] Instead, for the next 18 months, appellant and the Board engaged in intermittent correspondence and negotiations concerning the properties to the effect that, as the statute contemplates, see note 2 *supra*, appellant's buildings would not be demolished if appellant could sanitize or rehabilitate them. These discussions included a June 1984 letter to appellant from the Chief of the Board evidencing the continuing course of dealing between the parties.[4]

1. We present the facts, as we must, in the light most favorable to appellant. *Swann v. Waldman*, 465 A.2d 844, 846 (D.C.1983).

2. Neither the text of the order to show cause nor the text of any condemnation order is contained in the record. The order to show cause was presumably issued pursuant to D.C.Code § 5–703 (1981), which specifies the procedures for its issuance and for response to it. Section 5–703 also delineates the Board's authority to issue the actual condemnation order:

> If within the time to show cause fixed by the Board, the owner shall fail to show cause sufficient in the opinion of the Board to prevent the condemnation of such building or part of building, the Board shall issue an order condemning such building or part of building and ordering the same to be put into sanitary condition or to be demolished and removed within a time to be specified in said order of condemnation, and shall cause a copy of such order to be served on the owner and a copy to be affixed to the building or part of building condemned.

The condemnation order must afford the owner "reasonable time" within which to make the building sanitary, defined to be at least six months (unless there is an immediate danger to the public). D.C.Code § 5–705 complements § 5–703 by directing the owner of a condemned building either to make repairs sufficient to sanitize the building or to demolish the building. If the owner makes repairs satisfactory to the Board, "the order of condemnation shall be canceled." § 5–706. Finally, D.C.Code § 5–707 authorizes the Board to put into sanitary condition or demolish, at the owner's cost, any building with defects remaining after lapse of the time for repairs specified by the Board in its condemnation orders "or any extension thereof."

Although the record is not clear on the point, we assume the Board's condemnation order of March 1983 followed the statute in providing appellant an opportunity to correct the conditions leading to the condemnation order. However, even if the order were limited to demolition only, the subsequent dealings with the Board alleged by Miller could preclude summary judgment. See Part III, *infra*.

3. According to procedures for appeal of a Board order, an owner at the time pertinent to this case was entitled, pursuant to D.C.Code § 5–713 (1981) and 24 DCRR § 2.11 (1972) (currently at 10 DCMR § 3104), to appeal a condemnation order to the Condemnation Review Board (the "Review Board") within 15 days of notice of the condemnation order, and, pursuant to D.C.Code § 5–714 (1981), to appeal the Review Board's adverse determination to the Superior Court within 15 days of notice of its ruling. The reviews would have been *de novo* and automatically would have stayed the condemnation order, absent an immediate threat to the public.

4. The Board Chief stated:

> As you may recall, both you [appellant] and the Board were in agreement that these properties be secured by cinder blocking all openings that are accessible to the public. You also agreed that securing these properties would be started in two weeks regarding the removal of all trash and debris from the interior and exterior.

The letter concluded by advising appellant to "notify" the Board and "keep [it] abreast" of any work begun and proposals submitted to the Department of Housing.

However, in October 1984, without any further notice to appellant, the buildings were in fact razed at a cost of $10,000 per building assessable to appellant.

■ Appellant filed his complaint in the instant action against the District on October 7, 1985, alleging that the demolitions violated his Fifth Amendment due process rights, the Civil Rights Act of 1871, 42 U.S.C. § 1983 ("§ 1983"),[5] and the District of Columbia Administrative Procedure Act, D.C.Code §§ 1–1501 to –1511. Although the District did not initially file an answer and a default judgment was issued against it, it thereafter filed a verified answer and a motion to set aside the default judgment was granted on December 1, 1988.[6] The District then moved for summary judgment, which the trial judge granted.

## II

■ The trial court granted summary judgment on the ground that "the plaintiff failed to exhaust administrative remedies pursuant to the statutory procedures enact-

ed by Congress prior to seeking relief from the court [and thus, *a*] *fortiori*, this court is not empowered to grant the relief plaintiff is seeking."[7] However, neither party cited to the trial court the controlling Supreme Court decisions concerning exhaustion of administrative remedies in § 1983 litigation, *Patsy v. Board of Regents of Florida*, 457 U.S. 496, 102 S.Ct. 2557, 73 L.Ed.2d 172 (1982), and *Felder v. Casey*, 487 U.S. 131, 108 S.Ct. 2302, 101 L.Ed.2d 123 (1988), and the court thus failed to consider their effect. Appellant now argues that the trial court's "conclusion ... was and remains squarely, materially and irretrievably inconsistent with the explicit disposition of the issue by the Supreme Court." We agree. The exhaustion of District administrative remedies is not a prerequisite to bringing an action pursuant to § 1983 in the local courts of the District.[8]

### A

The doctrine of exhaustion of administrative remedies, well established in administrative law jurisprudence, provides "that no

5. 42 U.S.C. § 1983:
Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or *the District of Columbia*, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. *For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.*
The 1979 amendment of § 1983, which equated the District with the states in the language of § 1983 (adding the language in italics above), also explicitly amended 28 U.S.C. § 1343 to include the following language:
  (b) For the purposes of this section—
    (1) the District of Columbia shall be considered to be a State....
Act of December 29, 1979, Pub.L. No. 96–170, 93 Stat. 1284.

6. Appellant contests the trial court's decision to grant the District's motion to vacate the default. This argument is devoid of merit because, as Super.Ct.Civ.R. 55(c) states, "[f]or good cause shown, ... the court may set aside an entry of default" and the trial judge did not abuse his

discretion in finding such "good cause." The District explained that it had no notice of the complaint until about four weeks before it filed its motion and answer.

7. The trial court acknowledged that in extraordinary circumstances, exhaustion may be waived, but found no such circumstances here. *See Barnett v. District of Columbia Dept. of Emp. Servs.*, 491 A.2d 1156, 1160–61 (D.C.1985).

8. The District argues that by failing to make this legal assertion to the trial court, appellant is barred from relying on this argument on appeal. While it is of course true that arguments may not normally be raised for the first time on appeal, *Miller v. Avirom*, 127 U.S.App.D.C. 367, 384 F.2d 319 (1967), here reversal would be required in any event, as indicated in part III. Moreover, while not invoking the *Patsy* argument as such, appellant did assert in the trial court that the exhaustion doctrine did not preclude his action here. Accordingly, judicial efficiency calls for our disposition of the issue at this point. This is not to say that the determination of issues by the Board may not have some effect under doctrines of res judicata and collateral estoppel. *See University of Tennessee v. Elliott*, 478 U.S. 788, 798, 106 S.Ct. 3220, 3225, 92 L.Ed.2d 635 (1986) (res judicata effect of state administrative action in federal court litigation); S. Steinglass, Section 1983 Litigation in State Courts § 19.2(a) (1990).

one is entitled to judicial relief for a supposed or threatened injury until the prescribed administrative remedy has been exhausted." *McKart v. United States*, 395 U.S. 185, 193, 89 S.Ct. 1657, 1662, 23 L.Ed.2d 194 (1969) (citation omitted). *See generally* B. SCHWARTZ, ADMINISTRATIVE LAW, at 682–684 (2d ed. 1983). In *Patsy*, a federal court race and sex discrimination case brought against a Florida university under § 1983, the District Court granted a motion to dismiss for failure to exhaust state administrative remedies. After the United States Court of Appeals for the Fifth Circuit, sitting *en banc*, remanded the case for a determination whether exhaustion would be appropriate, the Supreme Court reversed, holding that "exhaustion of state administrative remedies should not be required as a prerequisite to bringing an action pursuant to § 1983. We decline to overturn our prior decisions holding that such exhaustion is not required." 457 U.S. at 516, 102 S.Ct. at 2568.[9]

In *Felder*, the Court extended the no-exhaustion rule of *Patsy* to § 1983 actions maintained in *state* courts. Justice Brennan, for the Court, concluded that "there is simply no reason to suppose that Congress ... contemplated that those who sought to vindicate their federal rights in state courts could be required to seek redress in the first instance from the very state officials whose hostility to those rights precipitated their injuries." *Id.* 487 U.S. at 147, 108 S.Ct. at 2311. The basis for the *Felder* holding was that "the dominant character-istic" of § 1983 actions is that "*they belong in court*" and that such causes of action "'exist independent of any other legal or administrative relief that may be available as a matter of federal or state law. They are judicially enforceable *in the first instance.*'" *Id.* at 148, 108 S.Ct. at 2312 (citation omitted; emphasis in original). Against the background of the lengthy history, both legislative and judicial, of a § 1983 no-exhaustion policy, the *Felder* Court held that the imposition of an exhaustion policy in state court would be a "judgment the current Congress must make." *Id.* at 149, 108 S.Ct. at 2312.[10] We hold, likewise, that unless Congress acts to impose exhaustion requirements, the no-exhaustion rule at work both in federal and state court § 1983 litigation applies in the local courts of the District as well.

## B

The District does not take serious issue with this proposition as a general matter, but argues that it is inapplicable here. It asserts that the existence of a congressionally enacted "comprehensive enforcement mechanis[m]," *Smith v. Robinson*, 468 U.S. 992, 1003, 104 S.Ct. 3457, 3463, 82 L.Ed.2d 746 (1984), encompassed in the condemnation statute, precludes an action under § 1983 by Miller. In *Golden State Transit Corp. v. City of Los Angeles*, 493 U.S. 103, 110 S.Ct. 444, 448, 107 L.Ed.2d 420 (1989) (citations omitted), the Supreme Court held that where a plaintiff has alleged the violation of a federal right

---

**9.** Recent cases of the U.S. Court of Appeals for the District of Columbia Circuit have applied *Patsy* and held that "exhaustion of state judicial and administrative remedies is not a prerequisite to a section 1983 federal court action alleging constitutional violations[, which] is particularly true where remedies available under the administrative scheme are not coextensive with those available in an Article III court." *Silverman v. Barry*, 234 U.S.App.D.C. 22, 24, n. 3, 727 F.2d 1121, 1123 n. 3 (1984) (citations omitted); *District Properties Associates v. District of Columbia*, 240 U.S.App.D.C. 21, 27 n. 3, 743 F.2d 21, 27 n. 3 (1984) ("the general requirement of exhaustion of administrative remedies is not applicable in § 1983 cases").

**10.** The *Felder* holding has been expansively applied in state court litigation. *See, e.g., Gibney v. Toledo Bd. of Ed.*, 40 Ohio St.3d 152, 532 N.E.2d 1300, 1304–05 (1988) ("A thorough reading of *Felder* indicates that it reaches well beyond the use of notice-of-claim requirements." "[B]y imposing an exhaustion requirement ... we would be forcing ... civil rights victims to comply with a requirement that is entirely absent from civil rights litigation of this sort in federal courts. *Felder* clearly objected to such a practice."); *Blackwell v. City of St. Louis*, 778 S.W.2d 711, 714 (Mo.Ct.App.1989) (civil service commission review of suspension of employee need not be pursued to final judgment before § 1983 action filed), *cert. denied*, — U.S. —, 110 S.Ct. 1784, 108 L.Ed.2d 786 (1990); *Arkansas State Medical Bd. v. Leipzig*, 299 Ark. 71, 770 S.W.2d 661, 662 (1989) (physician disciplinary case).

under § 1983, the defendant may show that "Congress 'specifically foreclosed a remedy under § 1983' by providing a 'comprehensive enforcement mechanis[m] for protection of a federal right,'" but that the "availability of administrative mechanisms to protect plaintiff's interests is not necessarily sufficient to demonstrate that Congress intended to foreclose a § 1983 remedy." Rather, the Court held, the statutory scheme must be such that if plaintiff were permitted to bring a § 1983 action, it "'would be inconsistent with Congress' carefully tailored scheme.'" *Id.* 110 S.Ct. at 449 (quoting *Smith v. Robinson, supra,* 468 U.S. at 1012, 104 S.Ct. at 3649). Finally, the Court put the burden on defendant to "demonstrate that Congress has expressly withdrawn the remedy," *id.,* of a § 1983 action, reasoning that

> "we do not lightly conclude that Congress intended to preclude reliance on § 1983 as a remedy" for the deprivation of a federally secured right. *Wright [v. Roanoke Redevelopment and Housing Authority,* 479 U.S. 418, 423–424, 107 S.Ct. 766, 770, 93 L.Ed.2d 781 (1987) (quoting *Smith, supra,* 468 U.S. at 1012, 104 S.Ct. at 3468)].

The District asserts that "[t]he remedial scheme that Congress crafted in [the] 1954 [condemnation act] is ... comprehensive, and it specifically and directly addresses the constitutional and other rights of owners in the condemnation of buildings alleged to be insanitary in the nation's capital." However, while the statutory scheme may provide some procedural safeguards and methods for contesting Board action, the District is stretching the Supreme Court's jurisprudence in this area in contending that the act provides mechanisms to remedy all federal rights violations, or is comprehensive or exclusive. The act provides no more than the perfectly standard and routine administrative process of a form of notice and a particularized hearing, followed by judicial review of the outcome of the hearing. It is a general administrative scheme not specifically intended to remedy all federal rights violations, nor by its own terms or by its history intended to supplant other congressionally provided forms of redress, and not enforced by an agency with peculiar expertise in fashioning all remedies which a judge in a courtroom setting could not be expected to have.

Thus, the District's reliance on *Smith v. Robinson, supra,* and *Middlesex County Sewerage Authority v. National Sea Clammers Ass'n,* 453 U.S. 1, 19–20, 101 S.Ct. 2615, 2625–2626, 69 L.Ed.2d 435 (1981), is misplaced. There, "the statutes at issue themselves provided for private judicial remedies, thereby evidencing congressional intent to supplant the § 1983 remedy." *Wright, supra,* 479 U.S. at 427, 107 S.Ct. at 772. In *National Sea Clammers,* the Court held that the statutory schemes at issue contained "so many specific statutory remedies including ... two citizen-suit provisions ... [t]hat Congress intended to foreclose implied private actions ... but also ... intended to supplant any remedy that otherwise would be available under § 1983." 453 U.S. at 20–21, 101 S.Ct. at 2626–2627. The statutes authorized "unusually elaborate enforcement provisions" and remedies for the dumping of materials into ocean waters near the United States coastline and for other types of water pollution, including compliance orders and civil and criminal penalties, supplemented by citizen suit provisions which permitted "private persons to sue for injunctions to enforce these statutes." *Id.* at 13, 14, 101 S.Ct. at 2623, 2623. In *Smith v. Robinson,* similarly the statutory scheme "itself allowed private parties to seek remedies for violati[ons of] federal law." *Wright, supra,* 479 U.S. at 423, 107 S.Ct. at 770. The Education of the Handicapped Act ("EHA"), at issue there, "was an attempt to relieve the fiscal burden placed on States and localities by their responsibility to provide education for all handicapped children." *Smith v. Robinson, supra,* 468 U.S. at 1010, 104 S.Ct. at 3467. The Court concluded that in light of the comprehensiveness of the "procedures and guarantees set out in the EHA," Congress could not have meant

> to leave undisturbed the ability of a handicapped child to go directly to court with an equal protection claim to a free

appropriate public education. Not only would such a result render superfluous most of the detailed procedural protections outlined in the statute, but, more important, it would also run counter to Congress' view that the needs of handicapped children are best accommodated by having the parents and the local education agency work together to formulate an individualized plan for each handicapped child's education. No federal district court presented with a constitutional claim to a public education can duplicate that process.

*Id.* at 1011–12, 104 S.Ct. at 3468 (footnote omitted).

The Court's later jurisprudence has confirmed the singularity of *Sea Clammers* and *Smith v. Robinson. See Wilder v. Virginia Hosp. Ass'n,* —— U.S. ——, 110 S.Ct. 2510, 2523, 110 L.Ed.2d 455 (1990) ("On only two occasions have we found a remedial scheme established by Congress sufficient to displace the remedy provided in § 1983"). In *Wright, supra,* a case involving an administrative scheme similar to that at issue in this case, the Court concluded that the statutory scheme evidenced no intent by Congress to preclude a § 1983 action. There, plaintiffs were tenants attempting to sue as a class a local housing authority that had allegedly violated their rights under federal statutes imposing ceilings on rents. The tenants alleged that the housing authority had overcharged them for their utilities by failing to comply with Department of Housing and Urban Development (HUD) regulations, in violation of the Brooke Amendment to the United States Housing Act of 1937, 42 U.S.C. § 1401 *et seq.* The statute provided for administrative remedies through formal and informal grievance hearings by local public housing authorities, in which tenants were entitled to notice of proposed adverse housing agency action, an impartial hearing officer, an opportunity to examine all pertinent documents, representation at the hearing, and a written decision, but did not provide judicial-type alternatives to access to the courts such as were present in *Sea Clammers* and *Smith v. Robinson.* The Court held that respondent had not "overcome its burden of showing that 'the remedial devices provided in [the Housing Act] are sufficiently comprehensive ... to demonstrate congressional intent to preclude the remedy of suits under § 1983.' " *Wright, supra,* 479 U.S. at 424, 107 S.Ct. at 771 (quoting *Sea Clammers, supra,* 453 U.S. at 20, 101 S.Ct. at 2626).[11]

As a state appellate court has recently said in construing *Smith v. Robinson* and the EHA to permit the use of a § 1983 action to redress federal rights claims of a *class* of handicapped children for whom there was no remedy provided in the EHA itself: "As *Wright* itself holds, we cannot infer that Congress intended to make citizens resort to an administrative procedure—to the exclusion of § 1983—where the administrative procedure fails to supply a remedy." *White v. State,* 195 Cal.App.3d 452, 464, 240 Cal.Rptr. 732, 738 (Cal.App. 1987). *See also* CHEMERINSKY, FEDERAL JURISDICTION, § 8.8, at 424 (1989) ("a statutory enforcement scheme will be deemed comprehensive only when it provides for both administrative and judicial remedies"); *Samuels v. District of Columbia,* 248 U.S. App.D.C. 128, 137–40, 770 F.2d 184, 193–96 (1985) (holding in the District of Columbia that Housing Act procedures and remedies were not sufficiently comprehensive to foreclose § 1983 remedy; District procedures under the act, which tenants claimed were not applied in practice, required an informal settlement conference, a hearing before an impartial officer if no settlement occurs, review by a District administrator, and, for tenants, a right to trial *de novo* in the local courts); *Gonzalez v. Pingree,* 821 F.2d 1526, 1529 (11th Cir.1987) (§ 1983 action available to remedy violations of Food

---

**11.** The Court's most recent consideration of the potential foreclosure of § 1983 remedies by a general state administrative procedure act resulted in a determination to "reject [the] argument that the availability of judicial review under the Virginia Administrative Procedure Act is relevant to the question whether relief is available under § 1983." *Wilder, supra,* 110 S.Ct. at 2525. Similarly, the Court held the "availability of an action under the [federal] APA" not to "foreclose a § 1983 remedy." *Id.* at 2524 n. 19.

Stamp Act; "As the Supreme Court reasoned in *Wright*, the generalized avenues of enforcement open to a federal agency are insufficient evidence of a congressional intent to prohibit a private judicial action under § 1983"). In *Golden State, supra,* similarly, the Court broadly held that § 1983 claims are available wherever the plaintiff asserts the violation of a federal right (statutory or constitutional) [12] and where the defendant cannot show that Congress specifically foreclosed such a remedy within an act with comprehensive enforcement mechanisms.

These cases establish that appellant's § 1983 action is not foreclosed by the provisions of the District's condemnation statute.[13] The condemnation statute, even if it could be seen to provide a remedy for the substantive due process violation of improper razing of Miller's buildings, provides no remedy for procedural due process violations such as the lack of notice and further hearing alleged here. See Part III *infra.* Such claims are not encompassed by the procedures of the condemnation statute, as was the case in *Smith v. Robinson.*[14]

Furthermore, *Robinson*'s overarching rationale was, in accord with *Golden State, supra,* simply that "§ 1983 is a statutory remedy and Congress retains the authority to repeal it or replace it with an alternative remedy." 468 U.S. at 1012, 104 S.Ct. at 3468. The District has offered us neither legislative history nor statutory language in the condemnation statute suggesting that Congress had intended to "repeal" the § 1983 remedy sought by Miller, or "to replace it with an alternative remedy." Thus, we are not persuaded that it has met its burden to show that Congress has "expressly withdrawn" the § 1983 remedy.

## C

This Supreme Court jurisprudence also demonstrates the difficulty with any reliance on *Urciolo v. Washington,* 305 A.2d 252, 254 (D.C.1973), to control the outcome here. In *Urciolo,* the plaintiff-appellants applied to the Superior Court for a restraining order after the Board gave them notice that their building was about to be demolished and, after a hearing, refused to stay the demolition. Appellants had previously been validly served with both an order to show cause, to which appellants had failed to respond, and a condemnation order, which appellants had failed to appeal. The Superior Court refused to stay the demolition and we affirmed.

On the appeal, we reviewed on the merits the sufficiency of the service of the notice to show cause and the condemnation order, and the fairness of the Board hearing on appellants' request for a stay. We further rejected appellants' arguments that their property was being taken without just compensation and due process of law. We did note appellants' failure to appeal the original condemnation order, and then stated:

> Thus the question of whether or not the property was in fact in an insanitary

---

**12.** We recognize that both *Wright* and *Golden State* permitted § 1983 actions in cases where the rights to be enforced were statutory in nature, whereas *Smith v. Robinson* concerned the enforcement of constitutional rights. However, *Golden State*'s language itself brings both types of cases within its reach, finding that § 1983 is generally "available to remedy a statutory or constitutional violation." 110 S.Ct. at 448–49.

**13.** We note that no *state* statute has been or could be held to preempt a § 1983 action, no matter how comprehensive, because of Congress' authority under the Supremacy clause, and thus, to the extent that D.C.Code § 5–703 *et seq.,* applicable only to the District, is not deemed a federal law for purposes of § 1983, see note 5 *supra,* it is not clear that it ever could foreclose a § 1983 remedy. We assume for the

purposes of this discussion, without deciding, that the statute is an act of Congress capable of preempting resort to § 1983 if sufficiently "comprehensive" and if Congress meant in enacting it to "expressly foreclose" § 1983 action. We also point out that the legislative history of the condemnation statute and its amendments is silent on the issue of foreclosure of § 1983 actions to remedy statutory or constitutional violations, and certainly does not affirmatively state that the statute was meant to include a mechanism to remedy constitutional violations.

**14.** Indeed, *Smith's* preemption holding was effectively overruled by an amendment to the EHA, which now permits private enforcement of equal protection violations via § 1983. *See* Pub.L. No. 99–372, 100 Stat. 796 (1986) (adding 20 U.S.C. § 1415(f)).

condition when condemned is now precluded and D.C.Code 1972 Supp. § 5–629 [now § 5–714, providing for Superior Court review of condemnation orders] cannot confer jurisdiction in the trial court over appellants' present cause of action as is alleged in the complaint. The statutory procedures established by Congress are exclusive.

*Urciolo, supra,* 305 A.2d at 254. The District claims that this language is the broad equivalent of an exhaustion requirement which precludes any action in the courts and that under that rationale, a § 1983 action is similarly precluded here. We disagree. First, in *Urciolo,* we in fact reviewed on the merits almost all of appellants' claims. Second, jurisdiction in that case was not based on § 1983. Third, we were dealing with a temporary restraining order and not relief for an already occasioned violation. Finally, to the extent that a broad reading of the decision conflicts with the more recent Supreme Court jurisprudence discussed above, the latter must of course control.

### III

Even if the no-exhaustion rule of *Patsy* and *Felder* did not provide a basis for reversal, Miller argues that the District had not succeeded in satisfying "the burden at summary judgment of making a prima facie showing that there was no genuine issue of fact in dispute and that it was entitled to judgment as a matter of law." *Vessels v. District of Columbia,* 531 A.2d 1016, 1017 (D.C.1987). In particular, he argues that there are disputed facts concerning whether the District violated his due process rights by failing to issue a new notice of condemnation after its 18–month course of negotiations with him following the issuance of its initial notice of condemnation.[15] While the record is far from clear, there is support for appellant's asserted confusion about when, and, indeed, whether the Board actually intended to demolish his buildings before October, 1984.[16] Moreover, there is no order to show cause, condemnation order, or any other official

---

**15.** Our conclusion is not affected by the District's argument that since appellant did not file a "statement of genuine issues setting forth all material facts as to which it is contended there exist[ed] a genuine issue necessary to be litigated," Super.Ct.Civ.R. 12–I(k), appellant could not prevail in opposing the motion for summary judgment. The failure to file such a statement "is not necessarily fatal to appellant's opposition to summary judgment." *Miller v. Greater Southeast Community Hospital,* 508 A.2d 927, 929 n. 4 (D.C.1986); *Holland v. Hannan,* 456 A.2d 807, 814–15 (D.C.1983). In his motion opposing the motion for summary judgment, and in its attached affidavit, see note 16 *infra,* appellant did squarely contest the Board's procedures and handling of his case, and indeed, raised every issue of material fact on which he relies on appeal, particularly those dealing with events subsequent to the entry of the March 1983 order. The District's motion for summary judgment, as relevant here, rested solely on the fact that appellant had not appealed that order.

**16.** In his affidavit attached to his motion in opposition to summary judgment, appellant alleged, *inter alia:*

From March 1983 to October 1984 when the property was demolished I made constant attempts to rectify the situation as well as made alternative suggestions to the Board as to other methods of solving this problem.

Although I had received notices concerning the condemnation, I did not believe that I was

in imminent danger of losing the properties for the following reasons:

1. The Board had initiated work which allegedly abated all violations and assessed the cost against the property.

2. The Board had changed its order from demolition to cleaning the building and blocking openings in June 1984.

3. The length of time and negotiations subsequent to the original orders.

4. I never received a "Show Cause" Notice subsequent to June 1984.

5. The Board allegedly held a hearing on June 27, 1984, related to the demolition of my properties; however, I was neither notified of the hearing nor allowed to present evidence.

6. There was no final order advising me of my appeal rights.

7. The fact that I had financial commitments and development of the project was imminent.

8. I was never, during the entire process, advised of why the Board had issued an Order to demolish the building in lieu of employing less injurious alternatives.

The affidavit also attached the June 1984 letter from the Chief of the Board evidencing the continuing course of dealings. See note 4 *supra.* The District presumably takes issue with a number of the facts asserted by appellant. They apparently were considered irrelevant at the time of the motion for summary judgment. See note 15 *supra.*

notice of the Board's intention to raze the properties in the record, nor could the District provide any of them at oral argument before us. See note 2 *supra.* Appellant therefore likens his case to *Miles v. District of Columbia,* 166 U.S.App.D.C. 235, 510 F.2d 188 (1975), where the U.S. Court of Appeals for the District of Columbia Circuit affirmed a judgment against the District, holding that to comport with due process, a six-year hiatus between the issuance of a condemnation order and the actual razing of buildings compelled the issuance of a new notice to condemn.

In *Miles,* plaintiff-appellee similarly received a notice to show cause why her buildings should not be condemned due to insanitary conditions, and, after a hearing and issuance of an order of condemnation pursuant to D.C.Code § 5–618 (1973) (condemnation procedure precursor to § 5–703), she failed to appeal to the Review Board. The order itself directed her to "abate the insanitary conditions or demolish and remove the buildings" and "a condemnation sign was placed upon the building." 166 U.S.App.D.C. at 237, 510 F.2d at 190. During the six-year period following the order, Miles attempted to restore the buildings after obtaining substantial financing and several extensions of time from the Board. As work on the buildings progressed, the Board took down the condemnation sign and, according to Miles, represented that the conversion work had gone too far for the building to come down. However, after inspections revealed incomplete work and evidence of debris and vandalism, the Board began sending a series of letters threatening action against the buildings unless Miles fully restored them. The Board waited until three years after the last extension expired before making an *ex parte* decision to demolish, and, with allegedly

deficient notice to Miles, ultimately razed the property.

Miles filed suit in federal district court, alleging a taking of her property without just compensation and a denial of due process of law. The District Court held that "the demolition of appellee's property violated due process in that the District failed to grant a hearing at a meaningful time and in a meaningful manner and to provide for adequate notice." *Miles, supra,* 166 U.S.App.D.C. at 237, 510 F.2d at 190 (citing *Miles v. District of Columbia,* 354 F.Supp. 577 (D.D.C.1973)). On appeal, the circuit court determined that such later "meaningful" notice would have constituted a new final and appealable decision; "[i]n fact, only after the [later] decision to process the buildings for demolition was final action truly 'pendent'." 166 U.S.App.D.C. at 239, 510 F.2d at 192. The court ultimately concluded that because "the owner was not placed on ... jeopardy notice and had in fact through a course of dealing with the government received every indication that no demolition was imminent," 166 U.S.App. D.C. at 240, 510 F.2d at 193, the "inescapable conclusion is that under the circumstances of this case due process required that the Board convey to Mrs. Miles notice of its [later] decision to finally have the buildings destroyed." 166 U.S.App.D.C. at 239, 510 F.2d at 192.

The reasoning and possible similarity of *Miles* would preclude summary judgment in the case before us.[17] Appellant here alleges that he did not believe the destruction of his buildings was imminent because a similar "course of dealing" with the Board "memorialized an agreement" between the Board and himself that rehabilitation of the properties would defeat the need for their demolition.[18] While the letter of the Board Chief, see note 4 *supra,*

---

**17.** The District argues that *Miles* is distinguishable because appellant did not allege that he had spent any money or made any efforts to correct the insanitary conditions that had led to the condemnation order. This seems an excessively restrictive reading of appellant's affidavit, and in any event, *Miles* does not necessarily establish such actions as absolute prerequisites to a due process claim. The development of the facts presented to the trial court was insufficient

to form the basis for a ruling on the applicability of *Miles,* one way or the other.

**18.** Since the letter of the Board chief to appellant was dated June 15, 1984, the District erred in contending that the documents appellant attached to his affidavit referred only to matters preceding issuance of notice to condemn of March 1983. The letter refers to an appearance by appellant before the Board on June 13, 1984.

does appear to create burdens that appellant had to surmount to avoid the condemnation order's mandate, it also may amount to the sort of abridgement or modification of Board intent to raze that occurred in *Miles*. Moreover, since Miller claims that the letter was the last word he received from the Board before the demolition, his argument may be more compelling than Miles' since Miles received a series of threatening letters. Finally, the Board in *Miles* made a new determination to demolish the buildings, even if *ex parte*, and attempted to provide notice by certified mail, non-registered letter, and publication. Here, the record does not reveal similar redetermination of the merits or subsequent attempts to notify appellant. If, on the facts as finally determined, a new notice was required in order to trigger appellant's right to appeal, no question of failure to exhaust administrative remedies could arise as a basis for summary judgment. *See Miles, supra,* 166 U.S.App.D.C. at 240 n. 4, 510 F.2d at 193 n. 4.

*Reversed and remanded.*